Scott GUARINO, Plaintiff,

v.

METROPOLITAN LIFE INSURANCE
COMPANY, Defendant.

Civ. A. No. 95–10226–DPW.

United States District Court,
D. Massachusetts.

Dec. 7, 1995.

William H. Shaughnessy, James A. Mc-Donald, Jr., Boston, MA, for Plaintiff.

Rita Gylys, Morrison, Mahoney & Miller, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

### I.

This case involves a dispute over the termination of disability benefits. Scott Guarino ("Guarino") alleges that Metropolitan Life Insurance Company ("MetLife") improperly terminated long term disability ("LTD") benefits which were due him under his employment agreement with his former employer, the Raytheon Company. The Raytheon Long Term Disability Plan (the "Plan") is an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), codified, in part, at 29 U.S.C. §§ 1001–1461.

Guarino initiated suit in Massachusetts Superior Court on January 3, 1995, alleging breach of contract. The action was removed by MetLife to this court on February 1, 1995, pursuant to 28 U.S.C. § 1441(b).[1] In response, Guarino filed an amended complaint on April 7, 1995, alleging that the termination was "arbitrary, illegal, capricious, unreasonable, not made in good faith, and a violation of fiduciary duty," as well as a violation of 26 U.S.C. §§ 401(a), 411, and 501(a) of the Internal Revenue Code. (Compl. ¶ 10.)

MetLife now moves for summary judgment, pursuant to Fed.R.Civ.P. 56, on the grounds that 1) Guarino's claim should be dismissed because the exclusive remedies to enforce rights under a welfare benefit plan are those set forth in 29 U.S.C. § 1132(a)(1)(B) of ERISA, while 26 U.S.C. §§ 401(a), 411, and 501(a) deal with *pension* plans and the tax treatment thereof; and 2) even if Guarino's claim is properly characterized as an action under ERISA, MetLife reasonably determined that Guarino was not qualified to continue receiving LTD benefits. (Def.'s Mot.Summ.J. at 1.)

---

1. In general, this court has jurisdiction over ERISA actions pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e) (vesting federal district courts with original jurisdiction for ERISA claims). Here, the state claims are preempted by the exclusive federal remedies under 29 U.S.C. § 1132(a)(1)(B). *See* discussion below, section III(A); 29 U.S.C. § 1144(a) (preemption clause) and *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (finding state common law claims preempted by ERISA and noting strong legislative history favoring preemption).

Guarino has not challenged the removal. I note that the Supreme Court, in *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (decided the same day as *Pilot*), upheld removal in a state tort and contract action in which the plaintiff had alleged improper termination of disability benefits under an ERISA covered plan. *Id.* at 66–67, 107 S.Ct. at 1547–48. Although the federal question was raised as part of a federal preemption *defense*, as an exception to the well-pleaded complaint rule, *see Louisville v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908), the Court upheld removal because Congress had completely superseded the plaintiff's common law actions by creating an exclusive federal remedy. *See also Fitzgerald v. Codex Corp.*, 882 F.2d 586, 587 (1st Cir.1989) (upholding removal of state claims, as an exception to well-pleaded complaint rule, due to ERISA preemption).

I will grant MetLife's motion for summary judgment.

## II. *Background*

### A. *The LTD Plan*

On January 21, 1985, at age 25, Guarino began work at Raytheon as an Electronics Inspector. Raytheon maintains an LTD Plan for eligible employees, in the event of disability. (Hartz Aff.Ex. 1 (Policy).) MetLife is the underwriter for the Plan. The Plan is a "welfare benefit plan" as defined by ERISA, *see* 29 U.S.C. § 1002(1), and the Summary Plan Description (pamphlet given to employees) states that it is covered by ERISA. (Hartz Aff.Ex. 2 at 12.)

For eligible employees who have elected to pay the monthly premiums, the Plan pays a percentage of the employee's base income in the event of "total disability." The Plan defines "total disability" in the following way:

> for the first twenty-four months following the greater of (i) the first 30 days in a continuous period of disability, and (ii) the expiration of benefits under … Accident and Sickness Insurance Program, [as] only such complete incapacity of the employee that the employee is *not able to perform substantially all of the duties of the employee's occupation, business or employment*. . . .

(Hartz Aff.Ex. 1 at 3 (Policy) (emphasis added).) After the first two years, "total disability" means that the employee

> is able to perform *none of the duties of any and every occupation, business or employment* … for which the employee is reasonably fitted by education, training or experience.

**2.** Guarino states that he began receiving LTD benefits in November of 1986 (Compl. ¶ 6), while MetLife states as an "Undisputed Fact" that he began receiving benefits on August 25, 1986. (Def.'s Mem.Supp.Mot.Summ.J. at 3.) Both agree that benefits ceased in July of 1993. Thus, in either scenario, Guarino had been receiving benefits for more than two years at the time of termination and, as a result, falls under the second definition of "total disability," as discussed above, for purposes of the legal analysis. Consequently, I do not find this particular dispute to be material.

**3.** Opinions of the following individuals grouped by evaluative role are considered here.

*Id.* (emphasis added). The Plan gives MetLife the discretionary authority "to determine eligibility for and entitlement to LTD benefits, and to make final decisions with respect to appeals from claim denials." (Hartz Aff. ¶ 7, Ex. 1, 2.)

In May of 1986, sixteen months after beginning work at Raytheon, Guarino sustained an injury to his lower back while working on his boat. He had previously injured his lower back in 1982. (Compl. ¶ 3–4; Hartz Aff. Ex. 12 at 2, Ex. 6 at 1.) In November of 1986, after exhaustion of accident and sickness benefits, which MetLife paid from May 30, 1986 through August 24, 1986, Guarino began receiving LTD benefits (Group No. 25792–004–4014; Claim No. 086086975). (Compl. ¶ 6.) [2]

### B. *Medical Opinions Preceding Termination*

Under the Plan, MetLife shall "have the right and opportunity to have a physician it designates examine the person of the employee when and so often as it may reasonably require during the period for which the employee claims benefits. . . ." (Hartz Aff. Ex. 1 (Policy) at 12.) Accordingly, MetLife arranged for Guarino to undergo several independent medical examinations, as well as vocational assessments, conducted by individuals who were not employees of Raytheon or MetLife. I note the following material observations: [3]

Dr. St. G. Tucker Aufranc ("Dr. Aufranc"),

Orthopaedic Surgeon

June 27, 1988 (Hartz Aff.Ex. 5 (emphasis added).)

1. The independent physicians to whom MetLife referred Guarino, including Dr. Aufranc, Dr. Taylor, and Dr. Salib.
2. The independent "vocational assessment" firms to whom MetLife referred Guarino, including IRP Medical and Rehabilitation Group, and Crawford & Company.
3. The in-house physician at MetLife, Dr. Allen, Director of the Medical Department.
4. The personal physicians of Guarino, including Dr. Brady and Dr. Mansfield, both orthopaedic surgeons, and Dr. Lehrich, a neurologist.

... totally disabled from his job as an electrical inspector. However, *I believe he could work in any capacity which would not involve excessive lifting, [b]ending, stooping, taking [sic], or squatting,* and which would allow him to alternate his position.

Dr. Howard Taylor ("Dr. Taylor")

February 14, 1990 (Hartz Aff.Ex. 6 (emphasis added).)

> ... I am a bit concerned about his diagnosis. [Mass. General Hospital states] that the CT scan showed bulging, but no true herniation. I reviewed Dr. Aufranc's report, and he said that there was a large herniated nucleus pulposus, but I do not know the basis of his statement. In my opinion Mr. Guarino's diagnosis is a sciatica, based purely upon his subjective symptoms. *I reviewed his job description, and I don't believe that he could perform that particular job. It involves some lifting, and prolonged sitting. I believe that he could perform some type of work that did not require prolonged sitting, or bending, or lifting, or twisting.* His prognosis is guarded for any future recovery.

Mr. Ralph Cavaliere ("Cavaliere")

IRP Medical and Rehabilitation Group ("IRP"), Vocational Assessment

March 13, 1990 (Hartz Ex. 7 (emphasis added).)

> Mr. Guarino is *not totally disabled from engaging in any and every gainful occupation* for which he is reasonably fitted ... [t]he claimant is capable of performing sedentary work activities provided they do not require any type of strenuous physical activity, including lifting, pushing, pulling and offer the individual the opportunity to alternate between a sitting and standing position through the course of a work day.

In addition, on April 1, 1990, IRP submitted an addendum which listed possible alternative jobs and descriptions, along with the applicable physical requirements. (Hartz Aff.Ex. 8.)

Nevertheless, in June of 1990, January of 1991, February of 1992, and January of 1993, Dr. Eugene Brady ("Dr. Brady"), an orthopaedic surgeon—and Guarino's personal physician from 1989 to 1993—examined Guarino and concluded each time that his condition was "unimproved" and that he remained "totally disabled." (Hartz Aff.Ex. 9.) During this period, MetLife continued to pay Guarino benefits.

On March 22, 1993, MetLife requested an additional independent examination by another orthopaedic surgeon, Dr. Philip Salib ("Dr. Salib"). (Hartz Aff.Exs. 10, 11.) Dr. Salib reported:

> From the very long history and many attacks of low back pain and right sciatica, it is clinically clear that his symptoms are discogenic in origin. None of the attacks was related to his kind of work except the very first one that took place in 1983–84 ... Although he is unable to do heavy work, the nature of his duties at Raytheon is relatively light. Therefore, it appears to me that he is *capable of doing his normal work at Raytheon. However, it is preferable to allow him to get up and move around frequently during the working hours.*

(Hartz Aff.Ex. 12 (emphasis added).) Dr. Salib based his report on an examination, records of Guarino's medical history, and copies of the 1989 and 1992 MRI results, the latter MRI showing "a more advanced stage than the former." *Id.* Dr. Salib did not see any "radiograms or the myelogram to comment upon," nor did he see the results of a third MRI scheduled for the coming week. *Id.*

Based on this report, MetLife wrote to Dr. Brady on April, 15, 1993, asking his opinion whether Guarino could perform the job of Electronics Inspector. (Hartz Aff.Ex. 13.) On May 7, 1993, Dr. Brady responded that because the job description involved "for the most part sitting for prolonged periods of time, and a certain amount of bending and stooping," he doubted Guarino would be able to perform the duties, even though it was "sedentary work." (Hartz Aff.Ex. 15.) Dr. Brady noted that Guarino "has never been able to do anything other than very seden-

tary activities," but also observed that his "sitting tolerance is limited." *Id.*

On May 20, 1993, MetLife again requested an independent vocational assessment, this time from the firm Crawford & Company ("Crawford"). (Hartz Aff.Ex. 16.) On June 8, 1993, having considered all the medical reports and possible job classifications, Crawford responded:

[I]t would appear Mr. Guarino does retain the residual functional capacity to perform sedentary to light duty work that allows frequent alternate change[s] of position and avoids forward flexion activities and sitting for prolonged periods of time. Mr. Guarino should be allowed to get up and move around frequently during the working hours.

(Hartz Aff.Ex. 17.) While the Crawford report found that Guarino would be unable to perform the job of Electronics Inspector, it suggested the alternate jobs of "Automobile Accessories Salesperson," "Electronics Tester," and "Parts Lister." *Id.*

Consequently, on June 23, 1993, MetLife notified Guarino that the LTD benefits would terminate on July 9, 1993 because Guarino no longer satisfied the definition, applicable after two years of disability, of "totally disabled." (Compl. ¶ 7; Hartz Aff.Ex. 1 at 3 (Policy).) The letter explained:

We have reviewed the medical information contained in your file which includes an Independent Medical Examination by Dr. Philip Salib. We also obtained an Independent Vocational Assessment. Dr. Salib felt that although you appear unable to do heavy work, the nature of your job at Raytheon Company is relatively light, and therefore it appears to Dr. Salib that you are capable of doing your job as a [sic] Electronics Inspector. In addition, the Vocational Assessment revealed that based upon your education, training, and experience, you possess transferable skills for alternative employment.

(Hartz Aff.Ex. 18.) [4]

C. *MetLife's Review*

On July 20, 1993, Guarino requested review of the termination, arguing that Dr.

Salib had only met with him for twenty-five minutes, and that more than being "unable to perform heavy work," as Dr. Salib reported, he finds it painful to even sit in an automobile. (Hartz Aff.Ex. 19.) In addition, Guarino stated that he was forwarding the July 1993 MRI, requested by Dr. James Lehrich ("Dr. Lehrich"), a neurologist at Massachusetts General Hospital. *Id.* On August 14, 1993, Guarino also wrote to Cheryl Robilotta at MetLife voicing his objections to Dr. Salib's report and to the assessment issued by Crawford. Guarino stated that the reports failed to mention 1) that although he had enrolled in educational classes, as Dr. Brady indicated (Hartz Aff.Ex. 15), he frequently missed class due to pain and that special arrangements were made to take final exams at home; 2) that he often needs to be able to lie down on a floor or bed to reduce the pain; 3) that he never underwent a fusion back operation as Dr. Salib reported; and 4) that he only met with Dr. Salib for twenty minutes. (Hartz Aff.Ex. 21.)

In turn, as part of its review, MetLife requested additional opinions from Dr. Brady and Dr. Lehrich to determine whether Guarino was indeed capable of performing any light duty job, as Crawford and Dr. Salib had concluded. On September 1, 1993, Dr. Lehrich responded that Guarino would "probably be able to perform sedentary work, as long as he could avoid forward flexion, prolonged sitting or lifting greater than twenty pounds." (Hartz Aff.Ex. 22.) On October 8, 1993, Dr. Brady responded, "I find he remains completely disabled because of chronic low back pain. He has had a recent MRI done on his back at the Massachusetts General Hospital on 07/18/93 showing degenerative disc disease." (Hartz Aff.Ex. 23.)

MetLife also requested an additional vocational assessment from Crawford, in light of the most recent medical reports and the July 1993 MRI. Crawford responded on November 15, 1993. The Crawford report stated that Guarino would be unable to perform the

---

4. Guarino inadvertently refers to this document as "Defendant's Exhibit 8." (Pl.'s Opp'n Summ. J. at 5.)

job of Electronics Inspector but that he possessed sufficient transferable skills to perform sedentary to light duty work within his "residual functional capacity based on his age, education and work experience." (Hartz Aff.Ex. 25.) However, the report stated that the alternate job of "Automobile Accessories Salesperson," suggested in Crawford's June 8, 1993 report, was no longer appropriate because it required forward flexion activities. "Therefore, we would replace this position with the job title of Maintenance Dispatcher." *Id.* "[T]he new employment alternatives would offer a wage commensurate within 52 to 83 percent of his previous annual salary of $19,822.44." *Id.*

MetLife's Director of the Medical Department, Dr. Dennis L. Allen ("Dr. Allen"), reviewed Guarino's entire file on November 3, 1993, and agreed with the latest vocational assessment. (Hartz Aff.Ex. 26.) Thus, on December 7, 1993, MetLife notified Guarino that upon review of all the doctors' reports, test results, and the vocational assessment, it would affirm the decision to terminate benefits. (Hartz Aff.Ex. 27.) Because Guarino did not meet the definition of being unable to work at *any* job for which he was reasonably fitted, he was no longer "totally disabled." *Id.*

Finally, on May 20, 1994, Guarino's counsel requested yet another review and forwarded a copy of an additional medical report by Dr. Frederick Mansfield ("Dr. Mansfield"), another orthopaedic surgeon and Guarino's personal physician from 1993 to the present. (Hartz Aff.Ex. 28; Pl.'s Opp'n Def.'s Mot. Summ.J. at 2.) Mansfield stated:

As of 2/3/94, when I last saw him, I believe that he was totally disabled for work. It is difficult to give a prognosis for this disability because I am not 100 percent sure of the diagnosis. However, my provisional diagnosis is degenerative disk disease. If

that is what the diagnosis actually is, I would expect his disability to last for a period of several months ... but to resolve spontaneously with time.

(Hartz Aff.Ex. 28.) In response, on May 25, 1994, MetLife wrote to Dr. Mansfield, asking specifically whether Guarino could perform *any* jobs. (Hartz Aff.Ex. 29.) Dr. Mansfield returned the MetLife form and checked "totally disabled," as of "2/3/94," but did not provide any explanation. (Hartz Aff.Ex. 30.) In addition, on MetLife's letter he wrote "yes" next to the question, "Is Mr. Guarino totally disabled as defined above?" *Id.*[5] MetLife forwarded Dr. Mansfield's findings to Dr. Allen for consideration. Dr. Allen affirmed his earlier decision that benefits should be terminated and noted that Dr. Mansfield "supplies no objective evidence to support" his conclusion. (Hartz Aff.Ex. 31.) MetLife notified Guarino's counsel of the decision, upholding termination, on July 1, 1994.

### III. *Discussion*

#### A. *MetLife's Request to Dismiss*

■ Subsumed in MetLife's Motion for Summary Judgment is a request to dismiss Guarino's entire complaint for failure to allege a claim upon which relief can be granted. MetLife correctly states that Guarino's complaint alleges only state common law claims and Internal Revenue Code statutes, 26 U.S.C. §§ 401(a), 411, 501(a). In turn, MetLife argues that ERISA, under 29 U.S.C. § 1132(a)(1)(B), provides the exclusive remedies for Guarino's claim, and thus the complaint should be dismissed.[6]

Here, the Plan is an "employee welfare benefit plan" as defined under ERISA, 29 U.S.C. § 1002(1). In addition, the Summary Plan Description states that the Plan is covered by ERISA (Hartz Aff.Ex. 2 at 12), and the Policy provisions contain the essential

---

**5.** Guarino inadvertently refers to this as Ex. 32, instead of Ex. 30.

**6.** 29 U.S.C. § 1132 provides:
(a) A civil action may be brought—
(1) by a participant or beneficiary—

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under

the terms of the plan, or to clarify his rights to future benefits under the terms of the plan. . . .

components of a benefit plan falling under ERISA. *See Wickman v. Northwestern National Ins. Co.,* 908 F.2d 1077, 1082 (1st Cir.), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990); *cf. Johnson v. Watts Regulator Co.,* 63 F.3d 1129, 1132–33 (1st Cir.1995) (discussing safe harbor provision as an exemption from ERISA, under 29 C.F.R. § 2510.3–1'(j)).

It is well-established that Congress intended for ERISA's civil enforcement remedies, 29 U.S.C. § 1132(a)(1)(B), to be exclusive. *See* 29 U.S.C. § 1144(a) (ERISA supersedes "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" as described in 29 U.S.C. § 1003(a), and not exempt under 29 U.S.C. § 1003(b)); *see also* 29 U.S.C. § 1144(c) ("State law includes all laws, decisions, rules, regulations or other State action having the effect of law"); and *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (finding state tort and contract claims preempted by ERISA and noting strong legislative history favoring preemption).

Moreover, the First Circuit has recently observed that where a state claim has "a connection with or reference to" an ERISA plan, or where a "court's inquiry must be directed to the [ERISA] plan," the claims are preempted. *Carlo v. Reed Rolled Thread Die Co.,* 49 F.3d 790, 794 (1st Cir.1995). *See also Rosario–Cordero v. Crowley Towing & Transportation Co.,* 46 F.3d 120, 122–23 (1st Cir.1995); *McCoy v. Massachusetts Institute of Technology,* 950 F.2d 13, 16–17 (1st Cir. 1991), *cert. denied,* 504 U.S. 910, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992).

Thus, there is no question that the state common law references in Guarino's complaint are preempted by ERISA. In addition, the Internal Revenue Code provisions, cited by Guarino, are equally inapplicable. The statutes, 26 U.S.C. §§ 401(a), 411 and 501(a), establish the requirements for a "qualified trust" pension plan, including minimum vesting standards, in order to reap favorable tax benefits.[7]

■ Nevertheless, there is no need to dismiss the complaint. "The 'theory of pleadings' doctrine, under which a complaint must proceed upon some definite theory and plaintiff must succeed on that theory or not succeed at all, has been all but abolished under the federal rules." *Fitzgerald v. Codex Corp.,* 882 F.2d 586, 589 (1st Cir.1989). Pursuant to Fed.R.Civ.P. 8, a legal theory is not necessary if the plaintiff sets forth "sufficient factual allegations to state a claim showing that he is entitled to relief" under some cognizable legal theory. *Id.* (citation omitted). Here, Guarino has pleaded facts which could enable him to recover under ERISA's civil remedies, 29 U.S.C. § 1132(a)(1)(B). *See Rodriguez–Abreu v. Chase Manhattan Bank,* 986 F.2d 580, 583, n. 4 (1st Cir.1993) (reading into complaint a claim under 29 U.S.C. § 1132(a)(1)(B)). Thus, I turn to the merits of Guarino's allegations.

*B. MetLife's Motion for Summary Judgment*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In addition, I must view all facts in the light most favorable to the non-moving party. *Woods v. Friction Materials, Inc.,* 30 F.3d 255, 259 (1st Cir.1994). "When a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial, there can no longer be a genuine issue as to any material fact ... and the moving party is entitled to judgment

---

**7.** There is a connection, however, between the cited Internal Revenue Code provisions and the ERISA provisions of 29 U.S.C. § 1001 *et seq.* ERISA, established in 1974, provides a comprehensive federal statutory scheme designed to protect two types of "employee benefit plans": "pension plans" and "welfare plans." "Pension plans" provide retirement income, while "welfare plans" provide medical, disability, accident, legal, vacation or training benefits. *See* 29 U.S.C. § 1002(1) & (2). Title II of ERISA, Amendments to the Internal Revenue Code Relating to Retirement Plans, is codified chiefly at 26 U.S.C. § 401 *et seq.* Guarino inadvertently cites the latter provisions.

as a matter of law." *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 12 (1st Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995) (citation omitted).

### 1. Standard of Review

 Here, I must apply the proper standard of review in conjunction with the summary judgment analysis. The Supreme Court has held that a denial of benefits under 29 U.S.C. § 1132(a)(1)(B) "is to be reviewed under a de novo standard *unless* the benefit plan gives the administrator or fiduciary *discretionary authority* to determine eligibility for benefits or to construe the terms of the Plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 114, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989) ¨(emphasis added).[8] Only if a court finds language of discretionary authority will it employ an arbitrary and capricious standard, in effect allowing the trust to interpret terms, such as "total disability," within the trust. *See also Diaz v. Seafarers International Union*, 13 F.3d 454, 456 (1st Cir.1994).

 The question whether discretionary authority exists, however, must be closely analyzed.[9] The First Circuit has interpreted the *Firestone* rule "to mean that a benefits plan must *clearly grant* discretionary authority to the administrator before decisions will be accorded the deferential, arbitrary and capricious, standard of review." *Rodriguez–Abreu*, 986 F.2d at 583 (1st Cir.1993) (emphasis added) (holding de novo standard of review appropriate where delegated discretionary authority was unclear). *See also Allen v. Adage, Inc.*, 967 F.2d 695, 697–98 (1st Cir.

1992). In other words, "interpretation of terms of a plan *and determination of the validity of claims*" are not inherently discretionary without a clear grant *in the plan. Rodriguez–Abreu*, 986 F.2d at 583. (emphasis added). *See generally Cooke v. Lynn Sand and Stone Co.*, 70 F.3d 201 (1st Cir. 1995).

Lower courts have heeded this mandate, while recognizing the limitation that no "bright line has been drawn to indicate what language demonstrates a 'grant' of discretionary authority so as to warrant the arbitrary and deferential standard of review." *Perez–Rodriguez v. Citibank*, No. 93–2364CCC, 1995 WL 116353 (D.P.R. Mar. 15, 1995) (finding discretionary authority in broad language allowing administrator to "interpret and construe the Plan and, in general, to decide any matters arising thereunder") (citing *de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1187, n. 4 (4th Cir.1989) (collecting circuit cases)). *See also Kiley v. Travelers Indemnity Co.*, 853 F.Supp. 6, 10 (D.Mass. 1994) (finding "magic words" such as "discretion" are not necessary, but "explicit language" is required); *Jorstad v. Connecticut General Life Insurance Co.*, 844 F.Supp. 46, 54 (D.Mass.1994) (finding de novo review appropriate where discretionary authority is clearly absent, regardless if dispute concerns facts or interpretation of terms).

 Here, considering the evidence *in toto*, I find that the Plan granted sufficient "discretionary authority" to MetLife to warrant the arbitrary and capricious standard of review. For example, the Policy states:

---

**8.** I note that the Raytheon Employees Disability Trust is technically the "plan administrator" and MetLife, as underwriter, makes the determinations regarding benefits. (Hartz Aff. Ex. 1 at 12 and Ex. 2 at 12.) MetLife incorrectly states that MetLife is the plan administrator. (Def.'s Mem. Supp.Mot.Summ.J. at 1.) This detail is important because, under the First Circuit's analysis in *Rodriguez–Abreu v. Chase Manhattan Bank*, 986 F.2d 580 (1st Cir.1993), the Plan must clearly vest MetLife, and not the "plan administrator," with the discretionary authority. *Id.* at 583–84.

**9.** I recognize that Guarino's Memorandum appears to assume the "arbitrary and capricious" standard after stating, "Defendant argues the

standard for review is an 'arbitrary and capricious' test." MetLife, in support, relies on *Firestone*, other circuits, and older First Circuit cases, as well as the fact that MetLife's Plan has previously been found to contain "discretionary" authority. *See, e.g.*, this court's oral findings in *Grande v. Metropolitan Life Ins. Co.*, No. CA–92–12920–WD (D.Mass. Feb. 7, 1994) and *Albanese v. Metropolitan Life Ins. Co.*, No. 91–12059–MA (D.Mass. Mar. 29, 1993) (oral judgment). However, because this question often presents the defining issue in ERISA cases and because currently there is no "bright line" as to what constitutes discretionary authority, I will address the nuances of the issue, even though the parties do not.

**444**

Written proof covering the occurrence, character and extent of disability must be furnished to the Insurance Company within the period of 90 days following commencement of "total disability" ... Thereafter written proof of the continuance of such disability must be furnished to the Insurance Company ... *All proof of claim must be satisfactory to the Insurance Company.*

(Hartz Aff. Ex. 1 at 12 (emphasis added).) In addition, MetLife retains the right to have a physician examine the employee "so often as it may reasonably require," *id.,* and payment of claims throughout the period of "total disability" is "subject to due proof of claim." (Hartz Aff. Ex. 1 at 14.) Finally, the Summary Plan Description explains that if MetLife denies a claim, an employee can request a written explanation and a review, but denials are final otherwise. (Hartz Aff. Ex. 2 at 11.) "You should know that you won't receive payments from the plan under some circumstances.... [such as] if you fail to provide satisfactory medical proof that you're disabled."[10] (id. at 10.)

■ Thus, having found the requisite discretionary authority, the question becomes whether a reasonable juror could find that MetLife acted in an arbitrary and capricious manner.[11]

### 2. *Application of the Standard*

■ Initially, I note that the "arbitrary and capricious" standard is the "least demanding form of judicial review" and requires only that determinations be "rational in light of the plan's provisions," *Perry v.*

*United Food and Commercial Workers District Unions 405 and 442,* 64 F.3d 238, 242 (6th Cir.1995), as well as "reasonable" with no "abuse of discretion." *Firestone Tire and Rubber Co.,* 489 U.S. at 111, 109 S.Ct. at 948. *See also Govoni v. Bricklayers, Masons and Plasterers International Union of America, Local No. 5,* 732 F.2d 250, 252 (1st Cir.1984).

■ Nevertheless, Guarino believes that the decision was arbitrary and capricious. In support, Guarino presents a meandering and somewhat repetitious list of facts. I find that his recitation boils down to six allegations. Guarino argues that it was arbitrary and capricious: 1) to "ignore and criticize" Dr. Brady's and Dr. Mansfield's conclusion that Guarino is totally disabled; 2) to fail to provide an alternative job which would allow movement from sitting to standing "at will," as Drs. Lehrich and Salib recommend (Guarino notes, "[e]mployers do not permit nonproductive work periods outside of lunch or coffee break"); 3) to fail to provide physicians with job descriptions for the alternative jobs; 4) to rely on Dr. Salib's evaluation because he was unable to review certain test results; 5) to fail to give adequate written notice for the reasons of termination, as 29 U.S.C. § 1133 requires, and instead, to rely on Dr. Salib's findings that Guarino could return to the job of Electronics Inspector, when all other physicians disagreed; and 6) to rely on Dr. Allen's "sketchy" handwritten notes. (Pl.'s Opp'n Def.'s Mot. Summ. J. at 3–7.)

Even viewing all the evidence in the light most favorable to Guarino, I cannot find that any of these facts constitute "arbitrary and

---

**10.** Other circuits also support this finding. *See, e.g., Bali v. Blue Cross and Blue Shield Association,* 873 F.2d 1043, 1047 (7th Cir.1989) (finding limited discretionary authority in the provision: " 'Disabled' means that a Participant is, determined on the basis of medical evidence satisfactory to the Committee, wholly prevented ... from engaging in any occupation"); *Miller v. Metropolitan Life Insurance Co.,* 925 F.2d 979, 983 (6th Cir.1991) (same). *Cf. Ring v. Confederation Life Insurance Co.,* 751 F.Supp. 296, 298–99 (D.Mass.1990) (finding no discretionary authority in provision that allowed termination when administrator "deems [that] the employee has failed to furnish proof of the continuance of such total disability").

**11.** MetLife argues that this court, in conducting this analysis, should limit its review to the record which was before MetLife when it made the decision to terminate. (Def.'s Mem.Supp.Mot. Summ.J. at 16.) The First Circuit has not spoken directly to this issue, but lower courts have so held, especially when using an arbitrary and capricious standard. *See, e.g., McLaughlin v. Reynolds,* 886 F.Supp. 902, 906 (D.Maine 1995); *Kiley v. Travelers Indemnity Co.,* 853 F.Supp. 6, 14 (D.Mass.1994). Here, however, the issue appears moot because the entire factual record before me, with the exception of counsels' arguments, was also before MetLife when it reviewed its decision.

capricious" action. Guarino is obviously troubled by the fact that Dr. Salib, whose findings contributed to the initial termination, found him capable of performing his old job of Electronics Inspector, when others disagreed. (*See* discussion above, section II(B) & (C).) In addition, Guarino argues that Dr. Salib met with him for only twenty to twenty-five minutes and did not review certain test results.[12]

But Guarino fails to address the fact that MetLife's *final* decision, after two reviews, encompassed far more that Dr. Salib's initial findings. The final decision to terminate Guarino's benefits resulted not because Met-Life believed he could return to his old job, but because he failed to meet the applicable definition of "total disability":

> [A]ble to perform none of the duties of *any and every occupation*, business or employment ... for which the employee is reasonably fitted by education, training or experience.

(Hartz Aff. Ex. 1 (Policy) at 3 (emphasis added).) MetLife arrived at its final decision only after weighing the numerous medical opinions, dating from 1988 to 1994, of the independent physicians (Dr. Aufranc, Dr. Taylor, Dr. Salib), Guarino's personal physicians (Dr. Brady, Dr. Lehrich, and Dr. Mansfield), the in-house physician (Dr. Allen), all the test results, as well as the IRP and Crawford vocational assessments. The record includes numerous typed reports, as well as handwritten, marginally legible, notes from Dr. Allen *as well as* Dr. Lehrich, Guarino's neurologist. In the process, MetLife carefully reviewed its decision, always seeking updated opinions based on Guarino's new requests and submissions. All the physicians and vocational experts, except for Dr. Brady and Dr. Mansfield, believed Guarino could perform a sedentary job that allowed for changes in position and did not require movements such as lifting and squatting. (*See* discussion above, section II(B) and (C).)

Thus, the fact that there is a dispute between Guarino's physicians and the other

physicians does not establish arbitrary and capricious action. *See Jestings v. New England Telephone and Telegraph Co.*, 757 F.2d 8, 9 (1st Cir.1985) (reiterating that it is for the trustee of a plan, and not judges, to choose between reasonable alternatives). MetLife had the discretion to interpret the Plan, weigh the evidence, and make its own final determination. Because MetLife's determination was not lacking a "rational basis," I cannot "disregard" it. *Govoni*, 732 F.2d at 252. Furthermore, there is no question that MetLife met its duty under 29 U.S.C. § 1133 to provide adequate written notice and repeated review of the determination. (*See* Hartz Aff. Exs. 18, 27, and 32.)

 Finally, Guarino alleges that no employer would allow an employee to move around "at will" and that changing his position would automatically be unproductive. This is also insufficient to show "arbitrary and capricious" action. Guarino's belief is personal speculation and ignores the vocational assessments which made conclusions only after considering *both* the physicians' reports and possible job classifications. (Hartz Aff. Exs. 7, 8, 17, 24.) The fact that the physicians were not routinely sent job descriptions is irrelevant. Moreover, MetLife, under the Plan, was not required to actually *offer* Guarino alternative jobs; its duty was only to make a reasoned determination whether Guarino was unable to perform "any and every occupation ... for which [he was] reasonably fitted by education, training or experience." (Hartz Aff. Ex. 1 at 3 (Policy).) *See Jestings*, 757 F.2d at 11.

In sum, I am satisfied that MetLife did not act with arbitrariness or caprice when, upon review, it affirmed its decision to terminate Guarino's benefits.

*3. Attorney's Fees*

 MetLife has also requested an award of attorney's fees. Attorney's fees are available under ERISA pursuant to 29 U.S.C. § 1132(g)(1): "In any action under this subchapter ... by a participant, benefi-

---

**12.** I note, however, that MetLife's letter to Guarino indicated, with underlined emphasis, that it was *Guarino's responsibility* to bring all test results. (Hartz Aff. Ex. 11.) In addition, I find that Dr. Salib's report (four single-spaced typed pages) is the most extensive of any physician report.

**446**

ciary or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."

 The First Circuit has established a flexible five-part test, used by the majority of circuits, which considers: (1) the degree of bad faith or culpability of the losing party; (2) the ability of such party to personally satisfy an award of fees; (3) whether such award would deter other persons acting under similar circumstances; (4) the amount of benefit to the action as conferred on the members of the plan; and (5) the relative merits of the parties' positions. *Gray v. New England Telephone and Telegraph Co.,* 792 F.2d 251, 257–58 (1st Cir.1986) (finding no abuse of discretion following lower court's denial of attorney's fees to ERISA defendant). *See also Nash v. Trustees of Boston University,* 790 F.Supp. 48, 50 (D.Mass. 1991).

 The factors are guidelines, and all need not be required in each case. *Gray,* 792 F.2d at 257–58. In addition, the test is appropriate whether *either* party prevails, despite the fact that the second, third and fourth factors may be somewhat more applicable to, and favor, a prevailing plaintiff, rather than a defendant. *Id.* at 258–59. In *Gray,* the court explained that ERISA was

> primarily intended to protect the interests of plan beneficiaries and participants; therefore, such a "bias" in the standard does not thwart the legislative injunctive that attorney's fees may be awarded to "either" party, in the court's discretion. Factors may simply not weigh equally where defendants rather than plaintiffs seek fees.

*Id.* at 259.

Here, I find the second and third factors argue against an award. Moreover, I do not find evidence of bad faith on the part of Guarino. There is no evidence that he fraudulently withheld records, misrepresented his condition, or refused to be examined. Rather, I find that Guarino, in good faith, believed that the factual dispute between his personal physicians and the independent physicians was sufficient to prevail. Guarino manifested not bad faith, but a misunderstanding of the

correct legal standard, and especially its application. Furthermore, given that the applicable standard of review is often a close question in ERISA cases, I cannot find that the "relative merits of the parties' positions" was so disproportionate as to justify an award of attorney's fees.

### IV. *Conclusion*

For the reasons set forth more fully above, MetLife's motion for summary judgment is GRANTED. MetLife's request for attorney's fees is DENIED.