USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1488 DOMINGO DIAZ, ET AL., Plaintiffs, Appellants, v. SEAFARERS INTERNATIONAL UNION, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Raymond L. Acosta, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Torruella and Boudin, Circuit Judges. ______________ ____________________ Carlos A. Del Valle Cruz with whom Jose Luis Gonzalez Castaner _________________________ _____________________________ was on brief for appellant Domingo Diaz. Mary T. Sullivan with whom Segal, Roitman & Coleman, and Ellen _________________ _________________________ _____ Silver, Associate Counsel, Seafarers Pension Plan, were on brief for ______ appellee. ____________________ January 10, 1994 ____________________ BREYER, Chief Judge. Domingo Diaz, a retired ___________ seaman, brought this lawsuit against the Seafarers International Union and the Union's Pension Plan. He says that the Plan should have provided him a pension of about $450 per month, rather than about $200 per month. The Plan's failure to do so, in Diaz's view, represents an erroneous application of the Plan's own pension-calculation rules and thereby violates federal law. See Employee ___ Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. 1104(a)(1)(D) ("[Plan trustees] shall discharge [their] duties . . . in accordance with the documents and instruments governing the plan . . . ."). The district court found that the Plan, through its trustees, did not improperly apply the Plan's rules. We agree, and we affirm the district court's judgment. I Background __________ A. Basic Facts. The following key facts are not ___________ contested: 1. From 1943 to 1960 Diaz worked on ships whose employees were represented by the Seafarers International Union (SIU). During that period, the SIU had no pension plan. 2. In 1960 Diaz quit. Soon after, he began working on ships whose employees were -2- 2 represented by the National Maritime Union (NMU). 3. In 1961 the SIU developed a pension plan -- the Seafarers Pension Plan -- covering seafarers who work on SIU-represented ships. 4. In 1968 Diaz, then still working on NMU ships, was injured and stopped working as a seaman altogether. 5. In 1975 Diaz recovered from his injury and began to work again as a seaman, this time on SIU ships. 6. In 1988 Diaz retired, at age 65, having spent the previous 13 years on SIU ships. B. The Seafarers Pension Plan. The Seafarers ____________________________ Pension Plan provides pensions based upon time worked on SIU ships, but not on other ships. It normally permits a seafarer to include, in the pension level calculation, time that he worked even before the plan first came into existence in 1961 -- even though employers did not contribute before 1961 and the relevant pension funds must therefore come from contributions (and related investment earnings) made in respect to work performed later, and by others. Despite the ordinary practice of crediting pre- 1961 work, the trustees gave Diaz credit only for the 13 years he worked on SIU ships after he recovered from his injury in 1975 and returned to SIU work. They denied him -3- 3 credit for the 17 years he worked on SIU ships before he left SIU employment in 1961 (and before the SIU had any pension plan) because they concluded that, in respect to that work, Diaz suffered a "break in service" under the plan's "break in service" rule. The rule prohibits counting work prior to a "break in service," defined as failure to perform 90 or more days of SIU work in each of three consecutive calendar years between 1968 and 1975 (when ERISA took effect). The rule states specifically: If during the period from January 1, 1968 to December 31, 1975, an employee received credit for less than 90 days of Service in each of three (3) consecutive calendar years, a Break of Service shall occur. If such a Break of Service occurs, said employee shall lose all credit for Service prior to and including said three (3) year period . . . . Seafarers Pension Regulations, Article 2, Section D(1). The upshot is that Diaz received a pension of about $200 per month (and without certain health benefits) instead of the $450 per month (plus such benefits) to which he believed himself entitled. C. Procedure. Diaz brought this lawsuit in _________ federal district court under ERISA, 29 U.S.C. 1132(a)(1)(B), which authorizes an employee action "to -4- 4 recover benefits due to him under the terms of his plan." ERISA requires trustees to follow their own rules, see id. ___ ___ 1104(a)(1)(D), and Diaz argues that the trustees have failed to do so by misinterpreting the break in service rule in applying it to his situation. The district court found against Diaz. II Standard of Review __________________ Ordinarily, a court will give trustees considerable leeway to interpret and to apply pension plan rules, setting aside those trustee decisions only if they are arbitrary, capricious, or an abuse of discretion. See, ____ e.g., Lockhart v. United Mine Workers of America 1974 ____ ________ ________________________________________ Pension Trust, 5 F.3d 74, 78 n.6 (4th Cir. 1993); Gordon v. _____________ ______ ILWU-PMA Benefit Funds, 616 F.2d 433, 439 (9th Cir. 1980). _______________________ Diaz points out, however, that the Supreme Court has said that this deferential standard of review is appropriate only where the "benefit plan" itself gives the trustees discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 _____________________________ _____ (1989); see also Allen v. Adage, Inc., 967 F.2d 695, 697-98 ___ ____ _____ ___________ (1st Cir. 1992). Diaz says that the version of the benefit -5- 5 plan in effect when he applied for a pension did not provide the trustees with the "discretionary authority" to determine eligibility or construe the terms of the plan. Hence, we must review trustee decisions de novo. __ ____ Diaz's argument is unconvincing, however. Firestone concerned certain terms ("reduction in work _________ force") set forth in what was in effect the basic trust instrument, which terms the trustees had construed against the employees. The argument in the case before us focuses on the application (and implicit interpretation), not of terms contained in the basic trust instrument, but of rules ______________________________________________ _____ promulgated by the trustees pursuant to powers delegated by ____________________________________________________________ that instrument. And, the distinction is important. _______________ The Firestone opinion turned on the traditional _________ legal doctrine that trustee powers are determined by the rules of law that are applicable to the situation . . . and by __ the terms of the trust as the court may ________________________________________ interpret them, and not as they may be _______________ interpreted by the trustee himself . . . . 3 W. Fratcher, Scott on Trusts 201, at 221 (emphasis added); see Firestone, 489 U.S. at 112. That is to say, ___ _________ courts ordinarily interpret (independently) the trust's terms. The Firestone Court concluded that, since _________ -6- 6 there is no evidence that under [the benefit plan] the administrator has the power to construe uncertain terms [i.e., terms of the trust] or that eligibility _____________ determinations are to be given deference, the proper standard of review is de novo. 489 U.S. at 111. _______ Traditional trust law, however, does not suggest that courts normally should, or do, substitute their judgment for reasonable trustee interpretations of trustee rules promulgated pursuant to powers that the trust instrument grants to those trustees. To the contrary, one would ordinarily assume that a trust instrument's grant of power to make rules and to apply rules carries with it (to avoid unnecessary administrative complexity) an implied power to interpret those rules reasonably and consistently with the instrument and other provisions of law. Cf. ___ Lockhart v. United Mine Workers of America 1974 Pension ________ _______________________________________________ Trust, 5 F.3d 74, 78 n.6 (4th Cir. 1993) ("Given that the _____ Trustees have the authority to formulate the rules and _________ regulations that implement the Plan . . . , it is not subject to question that the Trustees have the . . . discretion to interpret these rules and regulations . . . _________ .") (citations omitted) (emphasis added). And, courts would presumably review any such exercise of delegated rule- interpretive power as they would any other exercise of -7- 7 delegated power, i.e., with a degree of interpretive leeway that reflects the trustees' likely better understanding of how they intended their own rules to apply. Cf. Restatement ___ (Second) of Trusts 187 ("Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion.") I n this case, the terms of the trust itself are not in issue. The trust document, at the time of Diaz's application, gave the trustees broad, discretionary, authority to make, and to apply, rules governing eligibility for pensions. The document specifically said: The Trustees shall without limitation __________________ have the power . . . to . . . [f]ormulate and adopt a pension program . . . and promulgate and establish rules . . . for . . . [its] operation . . . and in pursuance thereto (but without intent to limit such authority) formulate and establish conditions of eligibility . . . and all other matters _________________ which the Trustees in their discretion ________________________________________ may deem necessary or proper to ________________________________________ effectuate the purposes and intent of ________________________________________ the pension program. ___________________ Seafarers Pension Agreement and Declaration of Trust, Article III, Section 1 (emphasis added). It added a general clause stating: The [T]rustees are empowered to do all ___ acts whether or not expressly authorized ___________________________________ -8- 8 herein, which the [T]rustees may deem necessary to accomplish the general purposes of the Trust. Id. Section 5 (emphasis added). ___ This language demonstrates broad trustee authority to determine the content of the rules they promulgate. The document provides no reason for finding any significant difference between 1) determining content through promulgating new rules, and 2) determining content by interpreting old ones. Hence, consistent with our discussion above, we interpret the document's explicit, and broad, power to create "rules" governing "conditions of eligibility" as carrying with it a similarly broad implied power to interpret those rules. And, the existence of such a delegated power seems to be what Firestone had in mind _________ when it called for "evidence" of a grant of discretionary authority to determine eligibility for benefits. Firestone, _________ 489 U.S. at 111; cf. Curtis v. Noel, 877 F.2d 159, 161 (1st ___ ______ ____ Cir. 1989) (holding that plan language giving plan administrator power to determine "which Employees are eligible to participate in the Plan" and "provid[ing] all parties dealing with the Plan an interpretation of Plan provisions on request" indicates deferential standard of review of trustee eligibility decisions); Jett v. Blue Cross ____ __________ -9- 9 & Blue Shield of Alabama, Inc., 890 F.2d 1137, 1138-39 (11th ______________________________ Cir. 1989) (same for plan language giving "Claims Administrator" power to make "final and conclusive" determinations "in the administration of the [plan]," so long as such determinations are "reasonable"); but cf. ___ ___ Sisters of the Third Order of St. Francis v. SwedishAmerican _________________________________________ _______________ Group Health Benefit Trust, 901 F.2d 1369, 1371 (7th Cir. ___________________________ 1990) (explaining that circuit courts appear split over the degree of plan language specificity required to trigger deferential review of trustee determinations). Finally, Diaz argues that the trustees, in effect, confessed that the SIU plan does not meet Firestone's _________ requirements for deferential review, for, after Firestone _________ (and after Diaz had applied for his pension), the trustees sought and obtained an amendment to the plan document giving them the "absolute and exclusive authority to . . . interpret Plan Rules" and "sole discretion to . . . apply" them. Not surprisingly, we think this amendment merely made express a power that, for reasons already stated, was plainly implied all along. (Why the trustees decided to clarify the plan's language in this way is not explained in the record; perhaps they wanted to play it safe in light of -10- 10 Firestone and the possibility that lower courts would later _________ misread it.) The end result is that we shall apply the "arbitrary and capricious" standard of review. -11- 11 III Review of the Merits ____________________ Diaz concedes that his absence from work after being injured counted as a "break in service" under the plan's "break in service" rule as literally interpreted. He ________________________ did not perform three months of SIU work in each of three consecutive years between 1968 and 1975. But, Diaz argues that the trustees should not interpret the rule literally. He says that they should not count an involuntary absence ___________ from work -- a break caused, for example, by an on-the-job injury -- as a "break in service" under the rule. And, he points to several circuit court cases that have held trustees' refusals to treat involuntary absences this way to be arbitrary and capricious. See, e.g., Van Fossan v. __________ ______________ International Bhd. of Teamsters Union Local No. 710 Pension ____________________________________________________________ Fund, 649 F.2d 1243, 1248-49 (7th Cir. 1981) (finding it ____ arbitrary and capricious to apply "break in service" rule to worker who leaves fund-covered employment involuntarily, such as because of a permanent shoulder disability, and citing other circuit cases on point). The problem for Diaz is that the trustees are willing to assume (for purposes of this case) that an involuntary absence does not count as a "break in service" ___________ ___ -12- 12 under the rule. But, that willingness is still not sufficient to win Diaz his augmented pension. That is because the trustees say that any such "involuntary absence" exception must involve an involuntary absence from SIU ___ service, not from some other kind of service. After all, one who left SIU service well before 1968 and works steadily thereafter in a totally different industry cannot, and should not be able to, overcome the "break in service" rule simply because an injury caused him to be absent (between 1968 and 1975) from that totally different job. _________________ The trustees also recognize that Diaz's case is not quite that simple. He did, indeed, leave SIU employment well before 1968 and he did not return to SIU employment until after 1975, and he was employed on NMU, not SIU, ships in the interval. But, when he did return to shipping, after recovering from his injury in 1975, he returned to work, not on NMU, but on SIU, ships. In light of this fact, it is at ___ least possible, as the trustees rightly suggest, that "but for his injury in 1968, he would have left the NMU ships and resumed shipping with the SIU" in time not to suffer a "break in service" under the rule -- in which case, the trustees further suggest, they would have ignored Diaz's post-injury absence. But, they add, the single fact that -13- 13 Diaz returned to SIU shipping after recovering from his _____ injury is not enough to show that he would have left the NMU (and returned to the SIU) without the injury. In their _______ view, in the absence of an injury, it is more likely that a seaman would continue in, rather than leave, his current job. We cannot quarrel with the reasonableness of the trustees' interpretation of their rule, at least on the assumptions they are willing to make. They assume an exception for an involuntary break in service; they understand the special situation of one who has left SIU employment before, but returns after, an injury; and, they impose a minimal factual SIU-connection, namely a showing that, without the injury, the seaman would have worked on SIU ships. But, whether or not Diaz made the requisite factual showing -- dependent as the question is on generalizations about how seafarers ordinarily behave -- is precisely the kind of matter that courts should leave in the hands of the trustees, who, after all, often must draw upon their knowledge of the industry in deciding how best to share a limited amount of money among different plan members with varying claims, of varying strength. See Richards v. ___ ________ United Mine Workers of Am. Health & Retirement Funds, 851 _______________________________________________________ -14- 14 F.2d 122, 123 (4th Cir. 1988) ("[W]e may not substitute our judgment of the facts in this case for that of the Trustees, for it is the Trustees whose expertise in this area arises from daily and continual experience.") (citation omitted). In these circumstances, and against the backdrop that the payment at stake here is for pre-1961 service (a time when no pension fund existed and no one made contributions on behalf of Diaz's work), we cannot say that the trustees' interpretation or application of their rule was arbitrary. Consequently, the judgment of the district court is Affirmed. ________ -15- 15