**Carlos M. VEGA–MUÑIZ, Plaintiff**

**v.**

**METROPOLITAN LIFE INSURANCE CO., et al., Defendants**

**No. CIV. 02–1117(JP).**

United States District Court, D. Puerto Rico.

July 31, 2003.

Raúl S. Mariani–Franco, San Juan, PR, for Plaintiff.

Ina M. Berlingeri–Vicenty, Goldman, Antonetti & Córdova, San Juan, PR, for Defendants.

### OPINION AND ORDER

PIERAS, Senior District Judge.

## I. INTRODUCTION

The Court has before it Defendants' Motion for Summary Judgment (docket No. 30), Plaintiff's Opposition to Defendants' Motion for Summary Judgment and Cross Motion for Summary Judgment (docket No. 33), Defendants' opposition thereto (docket No. 39), and Defendants' Supplement to Motion for Summary Judgment and Opposition to Plaintiff's Cross–Motion for Summary Judgment (docket No. 41). Plaintiff was formerly employed by Defendants Abbott Laboratories and Abbot Health Products. He was a beneficiary under a Group Long Term Disability ("LTD") benefit policy issued by Metropol-itan Life Insurance Company ("Metlife") through his former employer.

Plaintiff brings this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, for wrongful denial of benefits under ERISA and breach of fiduciary duty against Defendant Metlife. Plaintiff was covered by a benefits policy administered by Metlife as an employee at Abbott Health Products of Puerto Rico ("Abbott"). Plaintiff claims that he suffered from "Frontal Lobe Syndrome", an organic condition in the brain that results in mental disorders.

Defendant now move for summary judgment, alleging that, under the plan, Plaintiff's medical condition, which they found to be psychological, was only subject to coverage for a twenty-four month period. Defendants state that their termination of his benefits after that period ended was proper and was not arbitrary and/or capricious based on the standard set forth by ERISA.

## II. UNCONTESTED FACTS

The following facts are adapted from the uncontested facts as described in Plaintiff's Opposition (docket No. 33) and Defendants' Statement of Uncontested Material Facts. The parties have no disputes of material facts in this case.

1. Plaintiff Carlos Vega Muñiz was employed by Abbott in a manufacturing facility located in Barceloneta, Puerto Rico, for over twenty-three years.

2. Metlife is a corporation organized and existing under the laws of the State of New York with its principal place of business in New York, and is licensed to issue a contract of insurance in the Commonwealth of Puerto Rico.

3. Metlife issued the group Long Term Disability Plan (the "Plan") at issue in this litigation.

4. Abbott is Plaintiff's former employer and the party who established the Plan.

5. Abbott established and maintained a Plan for its employees for the purpose of providing benefits in the event of long-term disability.

6. The Plan is governed by ERISA.

7. Metlife has the responsibility of claim fiduciary for the provision of full and fair review of claim denials, pursuant to Section 503 of ERISA, 29 U.S.C. § 1133.

8. Pursuant to the Plan, "Disability" or "Disabled" means that, due to an injury or sickness, [claimant] require[s] the regular care and attendance of a doctor and:

   1. [claimant is] unable to perform each of the material duties of [claimant's] regular job; and

   2. after the first 24 months of benefit payments, [claimant] must also be unable to perform each of the material duties of any gainful work or service for which [claimant is] reasonably qualified taking into consideration [claimant's] training, education, experience and past earnings;

9. In its exclusions, the Plan provides the following "Mental Illness Limitation":

   While you are Disabled due to a Mental Illness and not confined in a hospital or institution, the Monthly Benefit will be payable up to lesser of:

   1. 24 months; or

   2. The Maximum Benefit Duration on the SCHEDULE OF BENEFITS.

10. The Plan defines "Mental Illness" as a "mental, emotional, or nervous condition of any kind."

11. Plaintiff began ambulatory psychiatric treatment with Dr. J.A. Mojica Sandoz in 1995, based on complaints of depressive episodes.

12. Plaintiff underwent treatment with Dr. Elías Jiménez in August 1996, also based on complaints of depressive episodes.

13. Plaintiff initially left his position at Abbott in May 1997.

14. Plaintiff returned briefly, then left permanently on October 31, 1997.

15. Plaintiff initially requested LTD Benefits from Metlife on December 19, 1997.

16. Plaintiff began to receive benefits effective January 1, 1998.

17. On June 10, 1999, Plaintiff sent Metlife the latest information from Dr. Elías Jiménez Olivo and Dr. Miguel Licha stating that his emotional condition was caused by an organic anomaly in his brain. The record from Dr. Jiménez Olivo's office included the last visit, dated May 24, 1999.

18. On July 7, 1999, Metlife's staff psychiatrist Dr. Ian Lipsitch issued an update to the diary entering date June 16, 1999, in which he stated: This is a 52 year old man with a several year history of a major Depressive disorder, recurrent type and "cyclothymic personality" He has been treated with an antidepressant (serzone) and mood stabilizer (. . . ium) but continued to be sufficiently impaired that he was awarded Soc. Sec. Disab. At this point, he is alleging that he is suffering from a physical illness since the doctors have told him that there were no environmental or external issues driving his depression. I have reviewed the file, much of

which is in Spanish. However, there is no indication of a neurological illness or other physical illness driving his disability. Major depression and Cyclothymia are considered to be mental and nervous rather than physical disorder, even though there may be genetic or other physical factors involved. They are generally thought to be psychiatric conditions and the limitation of the policy are meant to include such illnesses. There is nothing extraordinary about this case in that context.[1]

19. Metlife asked its Staff Psychiatrist, Dr. Lipsitch, to review the new medical information it received.

20. Metlife also sought review from an independent psychiatrist, Dr. Luis E. Canepa.

21. On July 14, 1999, Dr. Lipsitch reported the following regarding to the additional information provided by Plaintiff to Metlife:

This claim was recently reviewed by this reviewer and my comment is that the diagnosis which have been offered by the AP, namely Bipolar D/O and major depressive disorder, are typically thought of as psychiatric disorders, i.e. mental and nervous disorders, regardless of etiology, be it biologic or functional. Additional information received in form of claim form completed by AP and a letter from the AP, both reiterating the same diagnoses, does not change this reality the statement that bipolar disorder is considered to have a neurologic etiology notwithstanding. It does have likely hereditary factors and neurophysiologic aspects, but it still considered to be a psychiatric

disorder under generally accepted diagnostic or nosologic systems, e.g. DSM IV.

22. On August 2, 1999, Dr. Canepa issued a file review with the medical information that had been provided by Plaintiffs.

23. In the report issued, Dr. Canepa recognized that Plaintiff had a clinical history, prior to his first effective disorder episode, free of psychological limitations "as he was very effective in the work area, highly involved in his community, leading several civic organizations ... the history is negative for alcohol and/or substance abuse and no co-morbid disorders were present. No precipitating psychosocial stressors or factor could be elicited to account for the above described psychotic episode."

24. By letter dated September 29, 1999, Plaintiff was informed that the benefits would terminate because he was not covered past the 24 month period.

25. Plaintiff was then informed that the file had been reviewed by Metlife's staff psychiatrist and by Dr. Canepa, and that they were of the opinion that the condition suffered by Plaintiff was a mental and/or psychiatric condition.

26. Benefits under the Plan were paid through December 31, 1999.

27. Plaintiff requested a review of the decision to terminate benefits in a letter dated November 5, 1999.

28. As requested by Metlife, Plaintiff submitted evidence to support the diagnosis of Frontal Lobe Syndrome. As part of those documents, which

---

1. The text for this quote is cut-off in places. The Court has added the additional cut-off words to the quote for the sake of clarity.

included clinical tests, Plaintiff submitted the following:

a) Letter dated December 18, 1999, from treating psychiatrist Elías Jiménez, stating that Neurologist Heriberto Acosta and Neuropsychologist Dr. Montijo "reached an agreement that the finding and manifestations of the patient are compatible with Frontal Lobe Syndrome etiology" and that he was in agreement with this conclusion.

b) Report dated December 9, 1999, from Psychiatrist J.A. Mojica Sandoz.

c) Report Dated December 13, 1999, from Dr. Heriberto Acosta, Neurologist, stating that "... a Brain Spect on 11/23/99 was found compatible with Frontal Lobe Syndrome; Brain mapping on 11/23/99 was found to be abnormal, compatible with diffuse cortical disorder, which is worse on the left frontal area Long Latency P–300 on 11/23/99, abnormal and a Flash Evoked Response with Topographic Brain Mapping on 11/23/99, which found abnormal findings compatible with a deficit of the associative visual functions. He also made reference to a neuro-psychological test on 11/26/99 which was compatible with a neurocognitive process with frontal disexecutive manifestations (frontal) performed by Dr. Montijo. These findings in view of the patient's history and manifestation are compatible with a Frontal Lobe Syndrome of organic etiology."

d) Cerebral Tomographic study (Brain Spect.)

e) Letter dated December 13, 1999, to Dr. Heriberto Acosta from Jorge A. Montijo, Ph.D.

f) Long Latency Audiometry P. 300.

g) Spectual Analysis Study.

h) Flash Visual Evolved Response.

26. Metlife's staff psychiatrist, Dr. Ian Lipsitch, once again reviewed the medical information submitted by Plaintiff.

27. On January 12, 2000, Dr. Lipsitch reported that Plaintiff's condition of Bipolar Disorder was classified and treated by the DSM–IV and the general medical community as a primary psychiatric illness.

28. Dr. Lipsitch opined that, although Plaintiff provided evidence of a possible diagnosis of Frontal Lobe Syndrome (i.e., an organic condition in the brain resulting in a thought disorder), there was no suggestion in his previous record of any thought disorder.

29. Dr. Lipsitch noted that Plaintiff's claim for disability is based on a mood disorder, a condition not associated with Frontal Lobe Syndrome.

30. Dr. Lipsitch therefore concluded that the disability is based on symptoms of a mood disorder, not on a condition that might be suggested by more recent studies.

31. Said mood disorders are considered primary psychiatric conditions which fall under the M & N limitation clause.

32. In addition, Dr. Lipsitch rejected Plaintiff's contentions first, as "no claim was ever made prior to the denial that this EE had a Frontal Lobe-type problem, nor clinical symptoms compatible with any kind of diffuse cerebral lesions," and that, even if there was an association between topographic brain mapping and the Frontal Lobe Syndrome, "it would not necessarily change the meaning of the contractual clause defining the mental and nervous limitation."

33. On February 28, 2000, Metlife sent a letter to Plaintiff informing him that, based on the review of the medical information provided, it was upholding the denial of LTD benefits past the initial 24 month period applicable to mental illnesses.

34. Plaintiff was then informed that the determination constituted "completion of the full and fair review required by your Plan and federal law."

35. On March 25 and April 19, 2002, Plaintiff sent letters to Abbott regarding the revision of Metlife's denial of continued benefits.

36. In response to Abbott's request, Metlife decided to allow a second review of its denial to allow Plaintiff to provide additional medical evidence that Plaintiff claimed had not been reviewed by Metlife.

37. On May 5, 2000, Metlife sent a letter to Plaintiff informing him of its decision to grant a second review.

38. Although Metlife was informed that there was no additional medical information to be provided; it allowed Plaintiff the opportunity to provide a narrative report from his attending physicians. In addition, Metlife agreed to send another letter to Plaintiff, further explaining Metlife's previous denial decision.

39. Consequently, on May 26, 2000, Metlife sent a letter to Plaintiff to "address [Plaintiff's] concerns regarding [Metlife's] review" of the February 28, 2000, denial.

40. Metlife provided an explanation of the bases for its denial of continued benefits, as stated in the September 29, 1999, and February 28, 2000, letters.

41. The letter particularly explained to Plaintiff that Metlife considered the Temporal Lobe Syndrome diagnosis but that its in-house psychiatrist indicated that "[t]he Temporal Lobe Syndrome would cause different types of symptoms than the symptoms caused by your psychological condition. The symptoms that would be attributable to the Temporal Lobe Syndrome were not present in your prior medical records..."

42. That letter allowed Plaintiff a second opportunity to have his case reviewed, requesting from Plaintiff any new medical information or a narrative report from a Physician. Plaintiff was granted until July 5, 2000, to provide such evidence.

43. As requested by Metlife, Plaintiff produced an expert report, dated June 29, 2000, issued by Heriberto Acosta Vélez, Neurologist.

44. In this report, Dr. Acosta–Vélez included pertinent medical literature and his curriculum vitae.

45. Plaintiff also included a "Report of Neuro–Psychological Evaluation" by Dr. Montijo, dated December 21, 1999.

46. In the new narrative report, Dr. Acosta–Vélez explained to Metlife that "[f]requently patients with Frontal Dementia [also known as Frontal Lobe Syndrome] are diagnosed initially as depressed or bipolar disorder patients."

47. Dr. Acosta–Vélez stated that "[t]his is a well acknowledged fact in the neurological literature..." and included copies of several specific articles and books to support this point.

48. Metlife sent the case a third time to Dr. Lipsitch who issued another note on August 24, 2000, where he dismissed Plaintiff's allegations stating that the patient's symptoms were inconsistent with a diagnosis of dementia as the neuro-psychological

evaluation indicated only mild impairments.

49. On August 26, 2000, Metlife notified Plaintiff that it had completed a second review of his claim and informed him that it was reaffirming its prior decision to deny continued LTD benefits. Plaintiff was advised that no further administrative appeals reviews were available.

50. On October 24, 2000, Plaintiff's wife sent a letter to Abbott related to Metlife's denial of continued LTD benefits. The letter was accompanied by medical reports that had already been submitted to Metlife.

51. Another letter was sent to Abbott by Plaintiff's wife on September 29, 2000. That letter was also accompanied by medical reports already submitted to Metlife.

52. On December 5, 2000, Plaintiff requested that Abbott review Metlife's decision. Attached to the letter was Dr. Heriberto Acosta's report of November 26, 2000.

53. Metlife decided to review the case one more time on 4/24/2000 after discussing said matter with Abbott's employee, Lilliam Rivera. The memo to file prepared by Metlife on 4/24/2000 clearly states that:

"Abbott's Legal Department has reviewed the letter, and due to the apparent misunderstanding on the EE's part, they asked us to allow the EE to submit additional medical information to support his claim of a physical disability and review it as part of an appeal."

57. On April 28, 2000, Mrs. Lilliam Rivera once against asked Metlife to give a second review to the EE's file. Metlife then decided to send Plaintiff a letter stating that "... at the request of Abbott we (Metlife) will allow the EE to submit any additional medical information he has."

58. On May 5, 2000, Metlife informed Abbott's Mrs. Lilliam Rivera that "we (Metlife) would reconsider our prior denial if we receive new medical information..."

59. After Metlife's second denial of benefits, Abbott's employees contacted Metlife about a possible law suit.

60. The first such contact came from Mrs. Lilliam Rivera on October 4, 2000 and Mrs. Laura Beien who heads Abbott's Mainland Self Insured LTD Program.

61. On December 6, 2000, a note from the case manager of Plaintiff's file discusses Abbott's request for another review and the fact that Abbott wanted an outside physician to review Plaintiff's claim.

62. On December 20, 2000, Dr. Steven Lemmers, a psychiatrist, reviewed Plaintiff's medical information at Abbott's request. Dr. Lemmers issued a report, concluding: Carlos Vega–Muñiz does not have conclusive neuropsychiatric results that confirm a diagnosis of frontal lobe syndrome or a frontal temporal dementia. The neuro-psychiatric information could be explained by a medication effect or the effect of his underlying psychiatric illness.

63. On January 25, 2001, Metlife sent a letter to Plaintiff's attorney. The letter states that an independent physician file review was performed as part of Abbott's internal review. It also states that the reviewing physician agreed with the findings of both Metlife's internal and external physician file reviews. The letter also provided, "[a]s we stated in our prior letter of 8/26/00 to Mr. Vega, we have completed our final review of his appeals of

our denial of additional benefits on his Long Term Disability claim with our company and our decision is final."

64. Plaintiff filed a request for disability benefits from the Social Security Administration ("SSA") on December 22, 1997.

65. The SSA initially denied the request on April 1, 1998.

66. The denial was upheld on August 21, 1998.

67. Plaintiff requested a hearing for reconsideration of his second denial.

68. Plaintiff's request was finally approved on April 5, 1999. The SSA found that Plaintiff was disabled due to "a mental impairment."

69. The SSA judge concluded that Plaintiff suffered an effective disorder, expressly excluding an organic mental disorder.

70. The result of Plaintiff's claim before the SSA was issued on April 15, 1999 and was based on the testimony of Dr. Leticia Ubiñas, an expert designated by the SSA.

## III. LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides for the entry of summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir.1993); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 894 (1st Cir.1988). Summary judgment is appropriate where, after drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of material fact for trial.

*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if, based on the substantive law at issue, it might affect the outcome of the case. *Id.* at 248, 2509; *Mack v. Great Atl. & Pac. Tea Co., Inc.*, 871 F.2d 179, 181 (1st Cir.1989). A material issue is "genuine" if there is sufficient evidence to permit a reasonable trier of fact to resolve the issue in the non-moving party's favor. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1st Cir.1989).

The party filing a motion for summary judgment bears the initial burden of proof to show "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to show that "sufficient evidence supporting the claimed factual dispute [exists] to require a jury or judge to resolve the parties' differing versions of truth at trial." *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). The party opposing summary judgment may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through filing of supporting affidavits or otherwise, that there is a genuine issue for trial. *Id.; see also Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir.1993). On issues where the non-movant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion. *Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514–15.

## IV. CONCLUSIONS OF LAW

When a plan administrator has discretion to determine an applicant's eligibility for benefits, such as here, the administrator's decision must be upheld unless

"arbitrary, capricious, or an abuse of discretion." *See Vlass v. Raytheon Employees Disability Trust*, 244 F.3d 27, 29–30, *quoting Díaz v. Seafarers Int'l Union*, 13 F.3d 454, 456 (1st Cir.1994). This standard means that the administrator's decision will be upheld if it is reasoned and "supported by substantial evidence in the record." *See id., quoting Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir.1997). Evidence is "substantial" if it is reasonably sufficient to support a conclusion. *See Vlass*, 244 F.3d at 30. Moreover, the existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary. *See id.*

In this case, Defendants reviewed Plaintiff's request for benefits on multiple occasions. After Plaintiff first made a claim for benefits based on a physical illness, Metlife Staff Psychiatrist Dr. Lipsitch reviewed Plaintiff's file. He found that "there is no indication of a neurologic illness or other physical illness driving his disability. Major depression and cyclothymia are considered to be mental and nervous disorders rather than physical disorders..." (Record at 131). This conclusion supported Defendants' finding that Plaintiff was not entitled to further benefits under the plan because he had a mental condition, not a physical condition.

Defendants then received submissions from Plaintiff's doctors. Dr. Elías Jiménez, psychiatrist, through a letter dated June 21, 1999, diagnosed Plaintiff with Bipolar disorder and found that "the etiology of his condition is considered neurological in nature, since there are hereditary factors and neurophysiological disorders." (Record at 106). Dr. Miguel Licha diagnosed Plaintiff with "Bipolar Disorder, mixed, and Major Depression, recurrent" (Record at 111).

Dr. Lipsitch reviewed the new evidence and found that "Bipolar d/o and major depressive disorder, are typically thought of as psychiatric disorders, i.e. mental and nervous disorders, regardless of etiology—be it biologic or functional. Additional information received in form of claim form completed by AP and a letter from the HP, both reiterating the same diagnoses, does not change this reality ... the statement that bipolar disorder is considered to have a neurologic etiology notwithstanding. It does have likely hereditary factors and neurophysiologic aspects, but it is still considered to be a psychiatric disorder under generally accepted diagnostic ... systems" (Record at 95).

Defendants also sought the opinion of an independent psychiatrist, Luis Canepa, M.D., who submitted a "Psychiatric File Review" on August 2, 1999 (Record at 69–72). He discussed the findings and treatment of Plaintiff's physicians Olivo, Mojica, and Jiménez, explained his disagreement with their diagnoses, and concluded that, while the Plaintiff has severe symptoms and his psychiatric disorder imposes marked restrictions on his ability to perform his past work, his illness is a psychiatric disorder, not a neurologic disorder as claimed by Plaintiff's physicians.

Defendants gave Plaintiff the opportunity to submit additional evidence to support his claim. Plaintiff submitted additional information from Dr. Mojica Sandoz, M.D., a psychiatrist, Dr. Heriberto Acosta, M.D., a Neurologist, and Dr. Jorge Montijo, Ph.D. a Clinical Neuropsychologist.

In his letter of December 1, 1999, Dr. Mojica Sandoz expressed his disagreement with Dr. Canepa and emphasized that Plaintiff's condition is organic (Record at 28–32). Dr. Heriberto Acosta, in a letter dated December 13, 1999, stated that Plaintiff's symptoms were compatible with Frontal Lobe Syndrome of organic etiology (Record at 33). Dr. Montijo, in a letter

dated December 13, 1999, stated that the Plaintiff's symptoms could be compatible with Frontal Lobe Syndrome or with Frontal Temporal Dementia, and that his symptoms were much more compatible with an organic condition than a physical condition (Record at 35).

Defendants reviewed the appeal and affirmed their previous decision on February 28, 2000, explaining that Plaintiff's conditions over Major Depression and Bipolar Disorder are considered mental illnesses under the plan. Benefits payable for a disability caused by Bipolar Disorder or Major Depression, as they are mental illnesses, are limited to 24 months (Record at 39–41). Dr. Lipsitch noted that he had reviewed the file twice previously, then addressed directly and provided responses to the arguments made by Plaintiff's physicians (Record at 42–43).

On August 26, 2000, Defendants completed their second review of his claim, which carefully reviews and discusses all of the medical information submitted by Plaintiff that contradict Defendants' conclusion (Record at 313–315). The review specifically addresses and responds to each of Plaintiff's arguments.

On November 26, 2000, Neurologist Dr. Heriberto Acosta submitted an additional report to Defendants stating that Plaintiff's symptoms were compatible with frontal lobe syndrome.

Abbot Labs requested another independent review of the file by by Psychiatrist Dr. Steven Lemmers. On December 20, 2000, Dr. Lemmers reviewed the file and determined that Plaintiff did not have conclusive neurophsyciatric results that confirm a diagnosis of frontal lobe syndrome or frontal temporal dementia (Record at 325–335).

The Court recognizes that there exists contradictory evidence on the record. However, the existence of contradictory evidence does not constitute sufficient grounds for the Court to find that the decision of Defendants was arbitrary and capricious. *See Vlass*, 244 F.3d at 30. The Court also recognizes that there is a debate, both among the practitioners who play a role in this case and in the medical community, as to whether the symptoms displayed by Plaintiff are indicative of an organic or a mental disorder. However, it is not the role of the Court to determine whether Plaintiff's illness should be considered organic or psychological based on the definition contained in Plaintiff's benefits plan. Rather, the Court's role is to determine whether Defendants had substantial evidence to support their finding that Plaintiff's illness was not physical and did not fall under the definition contained in the plan. The Court finds that the Defendants possessed substantial evidence upon which to base this conclusion. Defendants possessed supporting opinions of one internal physician, Dr. Lipsitch, and two independent physicians, Doctors Canepa and Lemmers. In addition, Defendants performed multiple and thorough reviews of Plaintiff's claim and offered Plaintiff opportunities to submit new medical support for his claim. Defendants review was thorough and their conclusion was supported by substantial evidence on the record. Therefore the Court finds that, based on the evidence presented in the record, Defendants' decision must be upheld because is was supported by substantial evidence and was therefore not arbitrary, capricious, or an abuse of discretion.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment (docket No. 30) and **DISMISSES WITH PREJUDICE** Plaintiff's claims under the Employee Retirement In-

156

come Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461 against Defendants.

**IT IS SO ORDERED.**