Kathleen M. GREENE, Plaintiff,

v.

METROPOLITAN LIFE INSURANCE COMPANY, Defendant.

C.A. No. 95–0215T.

United States District Court, D. Rhode Island.

March 21, 1996.

Robyn K. Cossack, Kirshenbaum & Kirshenbaum, Cranston, R.I., for plaintiff.

Brooks R. Magratten, Vetter & White, Inc., Providence, R.I., for defendant.

## ORDER

TORRES, District Judge.

The Report and Recommendation of Magistrate Judge Lovegreen dated November 8, 1995, is accepted for the reasons stated by the Magistrate.

## REPORT AND RECOMMENDATION

LOVEGREEN, United States Magistrate Judge.

The plaintiff, Kathleen M. Greene ("Greene"), has instituted suit pursuant to 29 U.S.C. § 1132(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA") claiming that the defendant's, Metropolitan Life Insurance Company ("MetLife"), decision to deny her long term disability ("LTD") benefits was "arbitrary and capricious." Presently before me are both parties' cross motions for summary judgment. Fed. R.Civ.P. 56. This matter has been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B) and Local Rule of Court 32(c). A hearing was held on October 26, 1995. After listening to the arguments of counsel and examining the memoranda submitted, I recommend that MetLife's motion for summary judgment be granted and, consequently, Greene's motion for summary judgment be denied.

### Facts and Travel of the Case

As a full time, salaried employee of Decorative Specialties, a division of Specialty Coatings International, Inc., Greene participated in the Specialty Coatings Group Long Term Disability Plan ("disability plan"). At all relevant times in question, MetLife served as the claim fiduciary of the disability plan, which is subject to and regulated by ERISA. See 29 U.S.C. § 1003(a)(1).

The disability plan provides that "[w]hen (MetLife) receive[s] proof that you are Disabled, we will pay a Monthly Benefit in accordance with the Schedule of benefits." The definitional section defines "disabled" as follows:

due to an Injury or Sickness, you require the regular care and attendance of a Doctor and:

1. you are unable to perform each of the material duties of your regular job; and

2. after the first 24 months of benefit payments, you must also be unable to perform each of the material duties of any gainful work or service for which you are reasonably qualified taking into consideration your training, education, experience and past earnings; or

3. you, while unable to perform all of the material duties of your regular job on a full-time basis, are:

    a. performing at least one of the material duties of your job or any other gainful work or service on a part-time or full-time basis; and

    b. earning currently at least 20% less per month than your Indexed Basic Monthly Earnings due to that same Injury or Sickness.

In April, 1993, Greene filed an application for LTD benefits with MetLife under the disability plan. Sometime in July, 1993, MetLife began acting on Greene's application. At this juncture, Greene's application consisted of a document she completed entitled "Statement of Claim—Long Term Disability Benefits" dated April 23, 1993, and an "Attending Physician's Statement of Functional Capacity" completed by Dr. Vincent Armenio ("Dr. Armenio"), Greene's treating physician. Dr. Armenio, board certified in internal medicine and oncology, stated that Greene was suffering from "infection" and "fatigue." He also noted that plaintiff's immunoglobulin levels, specifically IgG3 and IgG4, had decreased. Dr. Armenio finally indicated that Greene was totally disabled as of the date of the report and would not be able to resume work related activities until September 1, 1993.

In letters dated July 15, 1993, MetLife requested information concerning the diagnosis and treatment of Greene from treating physicians Armenio and Charles Faber ("Dr. Faber"). The letters also requested that the doctors complete an enclosed physical capacities form. In his response dated July 23, 1993, Dr. Faber stated that Greene suffered

from "chronic fatigue" and that test results revealed "EB virus titer elevated." He also indicated treating Greene in February, 1993 and once in April, 1993. As such, Dr. Faber no longer considered himself her treating physician. He therefore offered no opinion as to whether Greene was totally disabled from performing her job.

In a letter dated August 10, 1993, MetLife informed Greene that the "information on file was not definitive enough to make a decision." As a result, MetLife indicated that it was requesting additional information from any of the physicians who had treated Greene for her ailment.

In his August 13, 1993 response to MetLife's July inquiry, Dr. Armenio stated that he had treated Greene ten times in the last five months. Dr. Armenio diagnosed Greene as suffering from "Chronic Fatigue Syndrome", ("CFS"), and "Immune Deficiency", which he indicated were being treated with "Gammaguard" treatments. After noting particular immunoglobulin levels, Dr. Armenio indicated that Greene was not able to work at this time, but tentatively anticipated a return sometime in October, 1993.

With his response, Dr. Armenio included a completed "Physical Capacities Evaluation" of Green expressing an opinion that in an eight hour work day Greene could sit up to four hours, stand up to two hours and walk up to two hours. The evaluation indicated that Greene could lift ten pounds or less occasionally and could utilize her hands in various capacities, except for "fine manipulating."

According to plaintiff, Dr. Armenio also sent a follow up report to defendant dated September 7, 1993. The report indicated that Greene was being "treated for Chronic Fatigue Syndrome with Immunce [sic] Deficiency." It also noted that she was being given double doses of gammaguard and that "[s]he still has problems with tennitis [sic] and chronic sore throats." However, Dr. Armenio found no evidence of "posterior or anterior lymthadenopathy."

MetLife asserts that on September 29, 1993, it received laboratory reports from Dr. Faber. One report, issued by New England Pathology Services and dated March 3, 1993, states:

> Results are suggestive of an Epstein–Barr virus infection at some undetermined time in the past. In infants, a similar antibody pattern may occur as a result of maternal transfer of antibody. EBV findings cannot be utilized as the sole criteria for the diagnosis of reactivated or chronic EBV-like syndromes

Finally, sometime in late September, 1993, MetLife sent all of the information it possessed to Dr. Julian Freeman, a medical consultant hired by MetLife. Dr. Freeman together with Doctors Ira Melnicoff and Karen Leone issued a report dated October 4, 1993.[1] The report in large part states:

**Medical Findings**

The medical reports describe severe fatigue with evidence of past EB virus infection. Quantitative immunoglobulin levels are slightly reduced from usual normals for IgA and a few of the IgG subclasses. No other laboratory abnormalities are reported. The available records do not describe the other findings of CFS, particularly fevers, node enlargement, or an extreme decrease in daily activities.

Weight loss, anemia, and other changes indicative or chronic illness are not described, and disuse changes or muscle atrophy are not mentioned.

**Diagnoses**

The available information is sufficient to diagnose past EB virus infection, and possible minimal reduction of some immunoglobulin types and subtypes. The reduction is so mild that a clear diagnosis in this latter regard can not be made without the normal values for the specific laboratory doing the testing. In addition, no clear cause is evident, and it is not clear that the reduction is persistent.

---

1. At all relevant times, John Freeman was board certified in Neurology Training and Internal Medicine; Ira Melincoff in Rheumatology and Internal Medicine; and Karen Leone in Internal Medicine.

The information available also does not permit us to independently confirm a diagnosis of CFS.

**Functional Capacity**

In assessing functional capacity, *we made the presumption that CFS was present,* even though we could not confirm that diagnosis. We also assumed the EB virus infection was in the recent past. Primary weight was given to these assumptions. Considering all available information, but assigning major weight was [sic] above, we concluded the individual was capable of lifting and carrying 30 pounds rarely, 10 pounds frequently, 20 pounds occasionally, walking and standing 6 hours a day, sitting for 8–10 hours a day, with occasional climbing, and no other limitations of function.

The main reasons for concluding this degree of limitation existed were the presumption of the presence of CFS and recent EB virus infection.

The main basis for concluding this degree of function was retained is:

the absence of evidence of recurrent fevers or node enlargement,

the absence of evidence of anemia or other indicators of severe chronic disease in general,

the absence of evidence of significant weight loss,

the absence of disuse changes and muscle atrophy.

The absence of any report of the last group of findings also indicates that in actual fact, activities have been at approximately the above level of function. If they had not been, some element of muscle atrophy and disuse change would be expected. (Emphasis added.)

According to MetLife, it sent a copy of the report to Dr. Armenio on October 7, 1993, requesting his comments. Apparently in response to the report, Dr. Armenio wrote an undated letter to MetLife concerning Greene's condition. In his letter, Dr. Armenio noted that Greene responded to bi-weekly gammaguard treatments, but after two

weeks without treatments she became "completely depleted of energies." He also stated that in his estimation, Greene could only work "half a-day maximum ..." Nowhere in the letter does Dr. Armenio respond to the Freeman group report.

During mid November, 1993, MetLife requested and eventually received all of Dr. Armenio's progress and examination notes concerning Greene. The notes showed that Greene at various time suffered sore throats, tinnitus, diarrhea, increased weakness and sleep related problems. All of Dr. Armenio's notes were apparently transferred to Dr. Freeman. There is no indication that they were not.

Dr. Freeman together with Doctors John Lindquist, John Adams and Ira Melincoff issued a second report, dated November 23, 1993, to MetLife based on a review of the additional information gathered by MetLife.[2] This report, in part, states:

**Medical Findings:**

The prior reports provided indication of prior EB virus infection, which we assumed to be relatively recent, and of mild reductions in some immunoglobulin subclass levels and IgA.

The additional information described a gradual but progressive and significant weight gain from about 122 pounds to nearly 130 pounds. On most exams, resting pulse rate is in the low to mid 70's, and occasionally in the 60's. No resting pulse of 80 or more is recorded.

No lymph node enlargement is noted, and all but one temperature is normal. Blood tests results are not reported.

Treatment has included immunoglobulin supplements. Levels have not been measured again.

No muscle atrophy or disuse changes are reported.

**Diagnoses:**

The available information does not provide any clear diagnosis of continued pathology at present. The IgG subclass deficiency may have been corrected partially by the

---

**2.** At the time in question, Dr. John Adams was board certified in P & N–Psychiatry and Dr. John

Lindquist in Endocrinology and Internal Medicine.

injections. The IgA deficiency would not be corrected by gamma globulin administration.

The progressive weight gain is suggestive of depression or an anxiety disorder, but this diagnosis can not be confirmed from the information available.

**Functional Capacity:**

In assessing functional capacity, primary weight was given to the symptoms as reported, to the extent of consistency with the objective findings. Considering all available information, but assigning major weight as above, we concluded that we could not define any clear physical or psychological limitation of function.

The main basis for concluding this degree of function was retained is:

the absence of fever (except on one occasion with acute intercurrent illness) or node enlargement,

the progressive weight gain,

the normal and low-normal resting pulse rates at all examinations,

the lack of any prediction of fatigue or functional loss due to IgA or IgG subclass deficiencies,

The expected complete resolution of EB virus infection by this date.

The absence of any muscle atrophy or disuse changes also provide strong indication that activities have, in fact, been at least at the sedentary level of exertional function.

**General Medical Comments:**

The progressive weight gain does raise the question of depression or dysthymia as underlying medical diagnosis or conditions. However, due to the absence of any other reported signs or symptoms of a psychiatric disorder, we could not confirm that any was present. Also for this reason, we could not estimate any functional loss due to disorder of this type.

*MetLife's Decision.*

In a letter dated December 13, 1993, MetLife notified Decorative Specialties that the company was denying Greene's claim. The letter stated that "the objective evidence submitted does not support the insured's inability to perform each of the material duties of her regular job."

After being informed of MetLife's decision, Greene sought a reconsideration through a letter dated February 1, 1994. In an effort to receive a favorable determination, Greene subsequently sent MetLife an April 2, 1993 letter and a July 23, 1993 report from Dr. Faber, a letter dated February 22, 1994 from Dr. Armenio, a letter from Reverend Joe Green and a December 7, 1993 report by psychiatrist Dr. Bruno Franek.

In a letter dated March 14, 1994, Allen Carlson, Unit Manager of MetLife, informed Greene that the additional information provided did "not substantiate total disability for 'your occupation' as defined by your insurance plan." The letter concluded that "the objective medical documentation we have in our file does not support disability." As such, Carlson never transferred Greene's additional information to Dr. Freeman.

Almost a year later, Greene's counsel sent a letter, dated February 15, 1995, to Carlson demanding that Greene's claim be paid. Carlson responded, in a letter dated March 24, 1995, stating that

An independent medical consulting group reviewed all relevant medical (evidence) and continue to conclude that your client is capable of gainful work at her own occupation ... the consultants' reports were sent to Dr. Armenio who failed to provide any objective evidence to challenge its conclusions. No additional evidence has been presented to warrant a rereview by the consulting group. Our file lacks objective medical evidence of a disabling condition and the medical records submitted fail to demonstrate that Ms. Green [sic] ever had a diagnosis of chronic fatigue syndrome by CDC criteria.

As a result, plaintiff instituted this action contending that MetLife's decision to deny her LTD benefits was arbitrary and capricious. Specifically, plaintiff avers that defendant acted arbitrary and capriciously by: (1) ignoring the diagnosis of plaintiff's treating physician Armenio; (2) relying on the reports of the non-treating, non-examining medical consulting group headed by Dr.

Freeman; (3) refusing to transfer her additional medical information to the Freeman consulting group; and (4) relying on the Freeman consulting groups' reports, which failed to show that Greene was not suffering from CFS.

## Discussion.

### I. Fed.R.Civ.P. 56.

■ Federal Rule of Civil Procedure 56(c) states that a party shall be entitled to a summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving part is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When determining a motion for summary judgment, I must review the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. *Mesnick v. General Electric Co.*, 950 F.2d 816, 820 (1st Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990). Thus, where no genuine issues are established as to any material fact and where the moving party is entitled to judgment as a matter of law, summary judgment must be granted in that movant's favor. *See Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir.1993); *Lawrence v. Northrop Corp.*, 980 F.2d 66, 68 (1st Cir. 1992).

### II. Appropriate Standard of Review.

■ Despite its comprehensiveness, ERISA fails to set forth the appropriate standard of review for suits under 29 U.S.C. § 1132(a)(1)(B) challenging benefit eligibility determinations. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 108–9, 109 S.Ct. 948, 953–54, 103 L.Ed.2d 80 (1989). However, in *Firestone*, the United States Supreme Court bridged this gap by declaring that [c]onsistent with established principles of trust law, ... a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard *unless the benefit plan gives the administrator or fiduciary discretionary authority to deter-

*mine eligibility for benefits or to construe the terms of the plan.* (Emphasis added.) *Id.* at 115, 109 S.Ct. at 956. Both parties agree that MetLife, as fiduciary of the disability plan, has the discretionary authority to determine eligibility benefits and that therefore, a more deferential standard of review governs the appropriateness of Met-Life's decision. *Id.* MetLife and Greene also acknowledge that this lesser standard of review requires a reversal of MetLife's determination of Greene's eligibility for LTD benefits only if such a decision was "arbitrary and capricious."

■ Court's applying the "arbitrary and capricious" standard in the ERISA context have stated that "the district court may overturn a decision of the Plan administrator only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law'." *Abnathya v. Hoffmann–La Roche, Inc.*, 2 F.3d 40, 45 (3rd Cir.1993) (quoting in part *Adamo v. Anchor Hocking Co.*, 720 F.Supp. 491, 500 (W.D.Pa.1989)); *see Short v. Central States, S.E. & S.W. Areas Pension Fund*, 729 F.2d 567, 571 (8th Cir.1984). Review under this standard is narrow and does not allow the court to substitute its own judgment for that of the administrator of a plan. *Abnathya*, 2 F.3d at 45. With these principles in mind I now turn to assess MetLife's decision denying Greene disability plan benefits.

### III. MetLife Did Not Act Arbitrary and Capriciously.

Given the deferential, applicable standard of review, I believe that MetLife's determination that Greene was not eligible for LTD benefits under the disability plan was not "arbitrary and capricious." An examination of the information available to MetLife when it made its decisions, as well as scrutiny of plaintiff's contentions clearly leads to such a conclusion.

### A. Plaintiff's Medical Literature and Allen Carlson's Failure to Turn over Information to the Freeman Group.

■ As a preliminary matter, plaintiff sets forth a number of articles from various medical journals attempting to show how the

Freeman consulting groups failed to diagnosis her condition. However, whether or not these articles are appropriately before me at this stage of the litigation, they all post date MetLife's initial eligibility determination and the Freeman consulting groups' reports. Additionally, all the literature was published after MetLife denied Greene's claim upon reconsideration, except for one article. There is no indication that this single article was ever brought to MetLife's attention by Greene or any of her physicians. As such, this literature is simply irrelevant for purposes of reviewing MetLife's decision.

■ The plaintiff also contends that Allen Carlson's refusal to transfer additional information to Dr. Freeman, which had been provided to MetLife by Greene, was "arbitrary and capricious." As noted, the additional information consisted of the following: an April 2, 1993 letter and a July 23, 1993 report from Dr. Faber, a letter dated February 22, 1994 from Dr. Armenio, a letter from Reverend Joe Green and a December 7, 1993 report by psychiatrist Dr. Bruno Franek. I will address each of these in turn.

At the time Greene provided this additional information, MetLife already possessed Dr. Faber's July 23, 1993 report which indicated that Greene suffered from "chronic fatigue", that test results revealed "EB virus titer elevated" and that he was no longer Greene's treating physician. Dr. Faber's April 2, 1993 letter merely stated that he had twice treated Greene in February, 1993, and diagnosed her as having "acute Epstein–Barr virus infection." He also noted that "[t]he symptomology of fatigue and a general feeling of illness may occur for a period of a few weeks to one year." In short, the April 2nd letter predated Dr. Faber's July report and added no new, material information concerning Greene's condition.

The letter from Reverend Green, Senior Pastor at Greene's church, The Gospel Temple, contained his personal observations of Greene over a period of years. However, there are no medical findings in his letter nor is there any indication that Reverend Green was qualified to render any sort of medical opinion as to Greene's condition.

Dr. Armenio's letter, dated February 22, 1994, stated that Greene suffered from "Immune Deficiency." It went on to note emphatically that Greene was totally disabled:

[o]nce again, so we all understand, my patient is totally disabled and I will not authorize her to become employed and I will not answer any more questions with regard to her disability until I, HER LICENSED PHYSICIAN, allows [sic] her to go back to work.

However, despite its rhetoric, the letter contained no new information pertinent to Greene's condition nor did it address either of the Freeman consulting groups' reports.

With respect to psychiatrist Franek's report, the small portions dealing with Greene's physical condition were largely based on statements made by Greene to Franek during his examination. In fact, his report mainly concerned Greene's mental state, cognitive abilities and social interactions. Based on his examination, which included no blood work or similar testing, Dr. Franek concluded that Greene exhibited "Chronic fatigue syndrome symptomatology" and did not possess "the ability to carry out instructions appropriately and cannot respond to supervision, co-workers, and work pressures in a work setting." There is also no indication that Dr. Franek relied upon Greene's previous test results or any of her prior physical evaluations in rendering his report.

Allen Carlson, unit manager of MetLife, refused to transfer this additional information to Dr. Freeman because he believed that this information did not warrant a rereview by Freeman and his colleagues. I believe his actions were justified. As noted, much of the additional evidence was cumulative, and the remaining information was offered by persons unqualified to render an opinion as to either CFS or Greene's physical capabilities. Therefore Carlson's decision was not "arbitrary and capricious."

B. *MetLife's Reliance on the Freeman Reports.*

■ The plaintiff next contends that MetLife's decision to rely on the reports of the Freeman consulting groups was improper.

Specifically, Greene avers that "[n]umerous cases have held that the report of a non-treating, non-examining physician is not entitled to great weight." Pl.'s Mem. in Supp. of Mot. For Sum. Jud. at 19. Therefore, plaintiff concludes that the consulting groups' reports do not constitute "substantial evidence."

However, of the cases cited by plaintiff, only one deals with a non-examining, non-treating physician's report in the context of ERISA. *Pierce v. American Waterworks Co., Inc.*, 683 F.Supp. 996 (W.D.Pa.1988). In *Pierce,* the court found the report of a non-treating, non-examining physician worthless. Such a conclusion was reached because the report was based on an ALJ's opinion of plaintiff's condition, a single letter from a treating physician and remained largely conclusory. The court stressed that the non-treating, non-examining physician did not request any records with respect to plaintiff and noted that his opinion "sounds more like a legal opinion than a medical one." *Id.* at 1001.

In contrast, the two reports issued by the Freeman groups were hardly conclusory. Instead, the groups listed the information they used in reaching their conclusions, discussed what weight had been given various information, and fairly methodically rendered an opinion on plaintiff's physical capabilities. Additionally, the Freeman consulting groups had before them the following information: treating physician Armenio's examination notes concerning Greene, various laboratory blood reports, Dr. Faber's reports, a physical capacities evaluation form completed by Dr. Armenio and Dr. Armenio's completed "Attending Physician's Statement of Functional Capacity."

The defendant also correctly points out that courts deciding ERISA claims have routinely approved of a claim fiduciary's use of a non-treating, non-examining physician's opinion in reaching an eligibility determination. *See, e.g., Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 601–2 (5th Cir.1994) (citing fact that claim fiduciary relied on opinions of non-treating, independent doctors in upholding fiduciary's determination to deny benefits to plaintiff); *Donato v. Metro-*

*politan Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir.1994) (upholding plan fiduciary's denial of claims where decision was based on a permissible choice between independent, non-examining medical consultants and plaintiff's doctors); *Marcum v. Zimmer*, 887 F.Supp. 891, 897 (S.D.W.Va.1995) (citing non-examining physician's opinion that plaintiff was not totally disabled to uphold plan fiduciary's decision to deny plaintiff benefits). Therefore, MetLife did not improperly rely on the Freeman group's reports in reaching its determination.

### C. *MetLife's Alleged Decision to Ignore Dr. Armenio.*

Greene's major contention is that MetLife acted arbitrary and capriciously by ignoring treating physician Armenio's observations and diagnosis. Specifically, plaintiff avers that MetLife did so after constantly requesting "objective medical evidence" from Armenio. Given the fact that no diagnostic test exists for CFS, Greene contends that such requests were absurd. However, a careful review of the information in this case reveals that MetLife did not ignore Dr. Armenio's observations and diagnosis.

Pared to its essence, this case comes down to a choice between the Freeman consulting groups utilized by MetLife and Dr. Armenio. Each of the doctors involved were board certified at all relevant times, in fields pertinent to the diagnosis and treatment of CFS. Furthermore, the Freeman groups, in rendering their opinions, had all the medical reports and findings that Dr. Armenio had before him, including Dr. Armenio's evaluation notes taken each time he examined Greene. In addition, the Freeman consulting groups had Dr. Faber's report and various laboratory test results. Sifting through all this evidence, the Freeman consulting groups set forth what they felt were relevant medical findings and based on this information rendered their opinions that Greene was not totally disabled from doing her job.

In the first report, dated October 4, 1993, the group determined Greene functionally capable of

> lifting and carrying 30 pounds rarely, 10 pounds frequently, 20 pounds occasionally,

walking and standing 6 hours a day, sitting for 8–10 hours a day, with occasional climbing, and no other limitations of function.

The main reasons for concluding this degree of limitation existed were the presumption of the presence of CFS and recent EB virus infection.

The main basis for concluding this degree of function was retained is:

the absence of evidence of recurrent fevers or node enlargement,

the absence of evidence of anemia or other indicators of severe chronic disease in general,

the absence of evidence of significant weight loss,

the absence of disuse changes and muscle atrophy.

The absence of any report of the last group of findings also indicates that in actual fact, activities have been at approximately the above level of function. If they had not been, some element of muscle atrophy and disuse change would be expected.

The second report dated November 23, 1993, again listed available medical findings, stated that the information presented did not "provide any clear diagnosis of continued pathology", and then rendered an opinion that Greene was under no "clear physical or psychological limitation of function." The report stated that

[t]he main basis for concluding this degree of function was retained is:

the absence of fever (except on one occasion with acute intercurrent illness) or node enlargement,

the progressive weight gain,

the normal and low-normal resting pulse rates at all examinations,

the lack of any prediction of fatigue or functional loss due to IgA or IgG subclass deficiencies,

The expected complete resolution of EB virus infection by this date.

The plaintiff, however, contends that these reports fail to show that Greene did not suffer from CFS. Greene reaches this conclusion by relying on recent medical literature including a December, 1994 article by the Center for Disease Control setting forth guidelines to diagnosis CFS.

First, as noted, the medical literature relied upon by plaintiff, including the guidelines for evaluating CFS, was published after the Freeman consulting groups issued their reports. Second, the initial Freeman report presumed that Greene suffered from CFS, but still concluded that she could continue to perform her job duties. It is imperative to note that whether or not Greene could perform her job duties was the relevant question in determining her eligibility under the disability plan, not simply being diagnosed with CFS.

Given the information presented to the Freeman groups and the relevant expertise of the individual doctors comprising these groups, MetLife's reliance on their reports to deny Greene's application for LTD benefits was not "arbitrary and capricious." As noted, this case involved a medical disagreement between qualified and capable doctors over Greene's functional capabilities. In such a situation, where all the medical experts possess virtually identical information, but their conclusions differ, the applicable "arbitrary and capricious" standard prevents a court from injecting its own judgment into the case to vacate a claim fiduciary's prior determination. *See Donato,* 19 F.3d at 380 (upholding plan fiduciary's denial of claims where decision was based on a permissible choice between independent, non-examining medical consultants and plaintiff's doctors).

### Conclusion

For the reasons stated, I recommend defendant's motion for summary judgment be granted and, consequently, plaintiff's motion for summary judgment be denied.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. Local Rule of Court 32; Fed. R.Civ.P. 72(b). Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the district court. *United States v. Valencia–Copete,* 792 F.2d 4

(1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980).

November 8, 1995.