**Robinson v. UNUM Life Ins.**         **CV-02-006-B    03/12/03**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>**Ralph Robinson**</u>

         **v.**                                 Civil No. 02-6-B
                                                 Opinion No. 2003 DNH 042
<u>**UNUM Life Insurance
Company of America**</u>

<u>**MEMORANDUM AND ORDER**</u>

     Ralph Robinson brings this action pursuant to the Employee
Retirement Income Security Act ("ERISA"), 29 U.S.C. §
1132(a)(1)(B) (1999), to recover benefits allegedly due to him
under the terms of his employer's long term disability plan (the
"Plan"), which is administered by Unum Life Insurance Company of
America ("UNUM"). Robinson alleges that the decision of UNUM to
terminate his disability benefits was arbitrary and capricious.
Before me are Robinson's motion for judgement on the
administrative record (Doc. No. 9) and UNUM's motion for judgment
on the administrative record (Doc. No. 8). For the reasons set
forth below, I deny Robinson's motion and grant UNUM's motion.

# I.  BACKGROUND

Robinson went to work for Cisco Systems as a manager of software development in 1995.  As a Cisco employee, Robinson was eligible to participate in the Plan.

## A.  The Plan

The Plan divides benefit eligibility into two phases. During the initial phase of up to twenty-four months, an employee is eligible for benefits if he cannot or is unable to perform "the material and substantial duties of [his] regular occupation due to sickness," and "[has] a 20% or more loss in [his] indexed monthly earnings due to the same sickness or injury." Administrative Record (Record) at 782.  After twenty-four months, an employee is eligible for benefits only if he is found to be "unable to perform the duties of any gainful occupation for which [he is] reasonably fitted by education, training or experience." Id.  The burden is upon the employee to provide satisfactory proof of the nature and extent of his disability.

The Plan also limits long term benefits beyond the twenty-four month period to disabilities that do not primarily rely upon

self-reported symptoms.  Self-reported symptoms means "the manifestation of [employee's] condition," which the employee reports to a doctor, "that are not verifiable using tests, procedures or clinical examinations standardly [sic] accepted in the practice of medicine."  Record at 790.  Fatigue is listed in the Plan as an example of a self-reported symptom.

B.    **Robinson's Claim:  The First Twenty-Four Months**

Robinson was diagnosed with sarcoidosis[1] in 1979.  He continued to work on a full-time basis, however, until he took a medical leave of absence from Cisco in March 1998.  In June 1998, he applied for disability benefits under the Plan.  As part of the application, a physician's statement was submitted by Dr.

---

[1]  Sarcoidosis is "a systematic granulomatous disease of unknown cause, especially involving the lungs with resulting fibrosis, but also involving lymph nodes, skin, liver, spleen, eyes, phalangeal bones, and parotid glands."  Stedman's Medical Dictionary (25th ed 1990).  According to the National Institute of Health of the United States Department of Health and Human Services (NIH), as cited by Robinson, fatigue is often a symptom of sarcoidosis.  However, the NIH also notes that "most people with sarcoidosis lead a normal life," and that the "symptoms, after all, are usually not disabling," and that "most patients can go about their lives as usual." www.nhlbi.nih.gov/health/public/lung/other/sarcoidosis.

-3-

Andrew G. Villanueva, Robinson's treating physician. Dr. Villanueva's statement indicated that the primary diagnosis for Robinson was "sarcoidosis, type II DM, hypertension, chronic fatigue." Record at 751. Dr. Villanueva listed "exertion involving upper & lower extremities" as the only limitation on Robinson's ability to work. Record at 752. There were no other limitations or restrictions indicated on Dr. Villanueva's statement.

After reviewing Robinson's claim, including Dr. Villanueva's clinical notes, UNUM determined that it was unclear how Robinson's sarcoidosis rendered him unable to work. Therefore, UNUM requested additional information from Dr. Villanueva on August 21, 1998. Dr. Villanueva responded to this request on September 14, 1998. Dr. Villanueva reported that "[h]is sarcoidosis has manifested itself mainly by skin lesions, interstitial lung disease and overwhelming fatigue. The fatigue has been difficult to eradicate and has severely diminished his capacity to physically function and intellectually concentrate for more than 1-2 hours a day." Record at 673.

On September 18, 1998, Dr. Villanueva also spoke with UNUM's Millie Blackstone, a registered nurse, and apparently informed

her that he "has noted increased fatigue from [Robinson's] history," but that the recent decrease in Robinson's prednisone[2] "may be causing the fatigue." Record at 667. According to UNUM's file notes, Dr. Villanueva also told nurse Blackstone that Robinson's "[p]ulmonary function tests have been fine . . . skin lesions and lung issues have been stable," and that Robinson should be able to return to work by January 1999. Record at 667.

On September 18, 1998, UNUM informed Robinson via telephone that his disability claim was approved. He was advised, however, that UNUM was "still unsure" as to what was causing Robinson's fatigue and why he was unable to work because of his sarcoidosis. Record at 665. UNUM notified Robinson that it expected him to return to work in January 1999, but if he did not return to work UNUM would require additional medical evidence of his continued disability.

In late January 1999, Dr. Villanueva determined that Robinson could only work part-time (3 hours a day from his home). In September 1999, UNUM asked Dr. Villanueva when it should

_____

[2]  Prednisone is a type of steroid typically prescribed to reduce inflammation.  www.webmd.com.

expect Robinson to resume a full-time work schedule. After repeated attempts to receive information regarding the status of Robinson's disability, Dr. Villanueva sent a letter to UNUM in January 2000. The letter stated that, due to Robinson's fatigue, it was still "medically reasonable for him to have his work hours limited" to 3 hours a day. Record at 445, 454. The letter also stated that, "[w]hile it is true that his pulmonary function tests . . . have been 'normal', this has not been the basis of his disability. His angiotensin converting enzyme continues to be elevated (it was last 53 on November 29, 1999) which indicates that the sarcoidosis itself remains active." Record at 445.

UNUM's associate medical director, Dr. Michael Randall, reviewed Robinson's file and responded to Dr. Villanueva's January letter on February 8, 2000. Dr. Randall questioned Dr. Villanueva's interpretation of the angiotensin converting enzyme level, noting that a level of 53 "would be very marginally elevated," and considering "confidence intervals, it could very well be normal." Record at 434. Dr. Randall also questioned how Dr. Villanueva's work limitation was determined, "other than from the patient," and requested updated lab tests. Record at 434.

-6-

According to UNUM, Dr. Villanueva called claims representative Megan Matselboba in response to Dr. Randall's February 8, 2000 letter. Matselboba's file notes allege that Dr. Villanueva stated that "[w]hen skin lesions flare, extreme fatigue is justifiable," and that "there is no other internal measure of [disability] except degree of fatigue [with] skin lesions as a barometer." Record at 390. As for the part-time work restriction, Dr. Villanueva allegedly indicated that this restriction was reasonable "based on [Robinson's] self-report he cannot [work] more than that [and] fact that skin lesions are present." Record at 390.

Robinson's skin lesions were treated by Dr. Samuel Moschella. Dr. Moschella's progress notes indicate that Robinson responded well to thalidomide treatment.[3] Indeed, in December 1999, Robinson experienced an 85% clearing of his lesions. Dr. Moschella noted the continued success of the thalidomide treatment on February 3, 2000, and again in March. Although Dr. Moschella noted Robinson's complaint of fatigue, he attributed

---

[3] Thalidomide is a medication which affects the immune system. www.webmd.com. Thalidomide is used to treat and prevent certain types of skin sores. Id.

this to depression for which Robinson was taking antidepressants. Dr. Moschella's progress notes also indicate that Robinson's

"fatigue syndrome" was independent from his diagnosis of sarcoidosis.  Record at 365.

In June 2000, UNUM sought an independent functional capacity evaluation (FCE) of Robinson.  Steven M. Coppola performed the FCE and concluded that, based upon Robinson's occupation, "Robinson is currently physically capable of functioning in the medium category of work for an eight hour work day in full time capacity."  Record at 211.  Also in June 2000, Dr. Randall again reviewed Robinson's medical file and considered the results of the FCE.  He concluded: (1) Robinson was physically capable of performing his regular occupation;(2) the medical file showed occasional references to fatigue and related it to other symptoms, such as depression; and (3) there was no objective support for Robinson's claim of "decreased intellectual concentration" as a result of Robinson's sarcoidosis.  Record at 202.

On July 6, 2000, an UNUM vocational rehabilitation counselor, John C. Meyers, was asked if Robinson could perform his occupation based upon the results of the FCE.  Meyers concluded that Robinson's job was a sedentary position and that,

based upon the results of the FCE, Robinson could perform his job.

## C.   Denial of Long-term Benefits Beyond Twenty-Four Months

On August 9, 2000, UNUM denied Robinson's claim for long-term disability benefits beyond the twenty-four month period. UNUM's denial was premised upon Dr. Randall's multiple reviews of Robinson's medical records and Dr. Villanueva's correspondence with UNUM, the results of the FCE, and Meyers' determination that Robinson's job was sedentary.  UNUM sent a letter to Robinson, stating:

> At this time, there is no medical data on file to support any restrictions or limitations which would preclude Mr. Robinson from performing the material duties of his sedentary occupation on a full-time basis as described above.  If you have new or additional information to support Mr. Robinson's claim for disability benefits, please provide it to this office within the next 30 days.  If Mr. Robinson has medical records that objectively support his claim of decreased intellectual concentration, such as neuropsych evaluations, he should provide these records for review.

Record at 197.  Robinson appealed the denial.  In support of his appeal, Robinson submitted the following: a letter from Dr. Villanueva; a vocational assessment report conducted by Jack Bopp (a certified rehabilitation counselor); Robinson's account of his

-10-

job duties; and literature on sarcoidosis. Dr. Villanueva's letter noted that an exhaustive evaluation had been done to discover the etiology of Robinson's "chronic fatigue symptoms." Record at 77. Dr. Villanueva stated that he had "no other explanation other than sarcoidosis to explain [Robinson's] disabling fatigue. Furthermore, Dr. Villanueva concluded that:

> While I have relied on Mr. Robinson's symptoms to gauge his degree of disability, my assessment is not based solely on his symptoms. I now have objective evidence that the sarcoidosis remains active in the skin and internally, based on the gallium scan. I do feel that his current symptoms of fatigue and inability to concentrate because of this fatigue are very likely due to his known diagnosis of sarcoidosis.

Record at 77.

Bopp's report concluded that "Mr. Robinson's problems with fatigue, concentration, malaise, and irritability would within reasonable rehabilitation professional probability preclude him from meeting the competitive demands of [his] position on a consistent basis." Record at 56. Bopp's conclusion was based upon a review of Robinson's medical records, the FCE, Dr. Villanueva's correspondence with UNUM, consultations with Robinson's doctors, and interviews with Robinson and his wife. Bopp conducted no independent tests of Robinson's physical or

-11-

mental capabilities. Bopp's report also rejected the results of the FCE, noting, inter alia, that "opinions regarding the implications of FCE findings for work capacity are[,] in general industrial/vocational rehabilitation practice[,] the province of Physicians not Physical Therapists." Record at 59. Lastly, Bopp's report classified Robinson's position as consistent with the United States Department of Labor's O*Net occupational title of computer and information systems manager.

On April 30, 2001, Dr. Randall again reviewed Robinson's file, including the most recent letter from Dr. Villanueva. Record at 44. After the review, Dr. Randall specifically rejected Dr. Villanueva's medical conclusions, stating:

> [Dr. Villanueva's] report does not provide evidence to support marked fatigue on a basis of [diagnosis] of sarcoidosis (e.g., significant abnormal lab tests). The abnormal thallium test showed some findings, but [Dr. Villanueva] didn't state[] date of test, nor how the findings were being treated - only that a Dr. Schick will evaluate [Robinson] for this. Even so, there is no evidence that there is cardiac disease to preclude sedentary work capacity. Also, [report] shows no [decrease] work capacity since 6/00. Conclusion - [Dr. Villanueva's] letter does not alter my prior opinion. Claimant is capable of sedentary to light work capacity.

Record at 44.

On May 3, 2001, UNUM rehabilitation counselor, Debra J. Clark, concurred only with Bopp's classification of Robinson's job as a computer information systems manager, and amended UNUM's vocational assessment to reflect her concurrence.  She also concluded that this occupation was a sedentary position.

On May 7, 2001, after reviewing the additional information submitted by Robinson,  UNUM upheld its decision to terminate Robinson's benefits.  UNUM found the additional information, including Dr. Villanueva's most recent letter, insufficient to reverse its previous decision.  UNUM's letter included the conclusions of Dr. Randall and noted that its vocational assessment determined that Robinson's job was sedentary.  UNUM's Quality Performance Unit concurred with the result.  It further noted that the Plan's twenty-four month limitation on benefits for "self-reported symptoms" (such as fatigue) had expired and Robinson was not entitled to benefits beyond the limitation. There were no other administrative appeals available to Robinson, who subsequently initiated this action.

## II.  **STANDARD OF REVIEW**

When the denial of benefits is challenged under ERISA

1132(a)(1)(B), "the standard of review depends largely upon whether 'the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan'" Leahy v. Raytheon Co., 315 F.3d 11, 15(1st Cir. 2002)(quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). If discretionary authority is given under a benefit plan, "a deferential arbitrary and capricious standard of review is mandated." See id.; see also Terry v. Bayer Corp., 145 F.3d 28, 37 (1st Cir. 1998). "This standard means that the administrator's decision will be upheld if it is reasoned and supported by substantial evidence in the record." Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 30 (2001) (quotation omitted). Substantial evidence means evidence that is "reasonably sufficient to support a conclusion." Id. The presence of contradictory evidence "does not, in itself, make the administrator's decision arbitrary." Id.

Robinson does not dispute that the Plan gives UNUM discretionary authority to determine eligibility for benefits. He contends, however, that I must, in essence, apply some form of heightened review because UNUM operated under a conflict of interest in making its decision. Robinson argues that UNUM

-14-

operated under a conflict of interest because it is responsible for determining whether a claimant is eligible for benefits and, if so, paying for those benefits.

The First Circuit recently held that, "[t]o affect the standard of review, however, a conflict of interest must be real. A chimerical, imagined, or conjectural conflict will not strip the fiduciary's determination of the deference that otherwise would be due." Leahy, 315 F.3d at 16 (citing Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998). It is conjectural to allege that a conflict exists simply because an award of benefits would come from the same entity that is responsible for determining the eligibility for those benefits. Without more, this general assumption does not indicate an improper motivation on the part of UNUM, and finding no such improper motivation given the circumstances of this case, I proceed "to simply ensure that the termination decision was not objectively unreasonable in light of the available evidence." Pari-Fasano v. ITT Hartford Life and Acc. Ins. Co., 230 F.3d 415, 419 (1st Cir. 2000).

## III.  DISCUSSION

Robinson claims that UNUM's decision to terminate his disability benefits was arbitrary and capricious.  He argues that UNUM's decision was based solely upon Dr. Randall's review of Robinson's medical records and the results of the FCE.  Robinson claims that Dr. Randall's opinions ignored or disregarded the opinions of Dr. Villanueva, and unreasonably required objective support for Robinson's symptom of mental fatigue.  Robinson also insinuates that UNUM employed a "scheme of denial" that was carried out in bad faith.  In response, UNUM argues that Dr. Villanueva's opinions were considered, but rejected, and that both Robinson and Dr. Villanueva repeatedly failed to provide objective support demonstrating that he was disabled because of mental fatigue.

### A.  Considering Dr. Villanueva's Opinion

The record is replete with evidence that UNUM repeatedly reviewed Dr. Villanueva's clinical notes and considered his opinions.  Furthermore, on more than one occasion UNUM requested additional information and clarification from Dr. Villanueva, presumably to ensure that Dr. Randall fully explored Dr.

Villanueva's medical findings and conclusions. Indeed, in its denial letters, UNUM directly addressed Dr. Villanueva's opinions. There is simply no basis to conclude that UNUM ignored or disregarded Dr. Villanueva's medical opinions.

What UNUM did not do (and what I perceive as Robinson's real argument here) is simply <u>accept</u> the opinion of the treating physician, Dr. Villanueva. Plan administrator's are not required, however, to give controlling weight to the opinion of a treating physician. See <u>Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.</u>, 32 F.3d 120, 126 (4th Cir. 1994); <u>see also</u> <u>Chandler v. Raytheon Employees Disability Trust</u>, 53 F. Supp. 2d 84, 91 (D. Mass. 1999); <u>Greene v. Metropolitan Life Ins. Co.</u>, 924 F. Supp. 351, 359-60 (D.R.I. 1996). Requiring a plan administrator to adopt the opinion of a treating physician would vitiate the administrator's role of determining whether an employee is disabled. See <u>Sheppard & Enoch Pratt Hosp.</u>, 32 F.3d at 126. Furthermore, when presented with conflicting medical opinions, such a requirement would also undermine the administrator's responsibility to weigh the conflicting evidence and make an informed determination regarding disability. <u>See</u>

Vlass, 244 F.3d at 32 (administrator's responsibility is to weigh conflicting evidence). Accordingly, absent certain circumstances, which are not present in this case, UNUM was simply not required to give conclusive weight to Dr. Villanueva's opinion. See Doe v. Travelers Ins. Co., 167 F.3d 53, 58 (1st Cir. 1999); Garcia v. Raytheon Employees Disability Trust, 122 F. Supp. 2d 240, 245 (D.N.H. 2000).

Additionally, it was not unreasonable for UNUM to rely upon the opinions of a non-examining physician, such as Dr. Randall, in reaching an eligibility determination. See Greene, 924 F. Supp. at 359 (collecting cases). This principle holds true even where the non-examining physician's opinion, as here, contradicts that of the examining physician. See id. at 359-60; see also Doyle, 144 F.3d at 184 ("Sufficiency, of course, does not disappear merely by reason of contradictory evidence.").

B.   **Evidence of Decreased Concentration**

In this case, it was reasonable for UNUM to request that Robinson provide objective support for his claim that he was disabled due to the symptom of mental fatigue. Robinson argues that fatigue includes a decrease in the ability to concentrate,

-18-

and that this is a well-known symptom of sarcoidosis.  Therefore, Robinson should not have been required to provide anything more than Dr. Villanueva's diagnosis of sarcoidosis and his conclusion that Robinson suffered disabling mental fatigue because of the disease.

I note that imposing an objective evidence requirement may be an abuse of discretion in some cases where the terms of the benefits plan do not mandate such a requirement, and the etiology of the disability cannot be rooted in objective medical testing. See Mitchell v. Eastman Kodak, 113 F.3d 433 (3d Cir. 1997) (finding it arbitrary and capricious to require objective evidence of chronic fatigue syndrome under terms of plan); see also Logue v. Reliance Standard Life Ins. Co., 2002 DNH 110 *3. In this case, however, the Plan expressly states that disabilities "which are primarily based on self-reported symptoms . . . have a limited pay period up to 24 months."  Record at 791. Two reasonable conclusions may be drawn from this limitation on self-reported symptoms.  First, UNUM apparently had no obligation to entertain Robinson's claim beyond the twenty-four month period if it reasonably concluded that his claim was primarily based upon self-reported symptoms of mental fatigue.  Second, the

Plan's limitation of benefits for self-reported symptoms leads to the rational conclusion that in order to recover benefits beyond the twenty-four month period, Robinson's disability had to be founded upon something more than his subjective reports of fatigue. In other words, either the self-reporting limitation applied and UNUM had no obligation to pay benefits beyond the twenty-four month period[4], or Robinson had to demonstrate that he was disabled by providing UNUM with something more than his subjective reports of fatigue.

This is not a case where UNUM disputed the etiology of the employee's disease. Rather, it questioned whether the manifestations of the condition rendered Robinson "unable to perform the duties of any gainful occupation for which [he was] reasonably fitted by education, training or experience," as mandated by the Plan. Record at 782. Based upon the terms of the Plan, most notably the self-reported symptoms provision, it was reasonable for UNUM to question Dr. Villanueva's medical opinion, which UNUM found to be based in part upon Robinson's

_____

[4] I note that UNUM, upon Robinson's administrative appeal, indicated that in addition to upholding its decision it concluded that Robinson's claim was limited by the self-reporting symptoms provision of the Plan.

-20-

self-reports, and seek additional objective support.

Dr. Villanueva's initial physician's statement indicated that the only limitation on Robinson's ability to work was "exertion of the upper and lower extremities." This suggests that the extent of Robinson's disability was physical in nature, and did not include mental fatigue. Dr. Villanueva, in response to UNUM's request for additional information, later stated that Robinson's symptom of fatigue "has severely diminished his capacity to physically function and intellectually concentrate for more than 1-2 hours a day." Record at 673. Thus, contrary to his initial physician's statement filed with Robinson's claim for benefits, Dr. Villanueva subsequently stated that Robinson suffered physical and mental fatigue.

Robinson's fatigue was, at one point, attributed to depression and withdrawal from various drug treatments - neither of which are necessarily permanent conditions. Dr. Moschella's progress notes echo these conclusions. Furthermore, Dr. Villanueva's medical conclusions regarding the basis of Robinson's mental fatigue appears to waiver between attributing it to chronic fatigue syndrome and sarcoidosis. Lastly, according to UNUM's file notes, Dr. Villanueva concluded that

Robinson's fatigue was justifiable "[w]hen skin lesions flare." Dr. Moschella's progress notes state that Robinson's skin lesions were 85% clear in December 1999, and that Robinson continued to experience significant improvement through March 2000. Despite the clearing of skin lesions, Dr. Villanueva concluded on February 3, 2000 that Robinson continued to be disabled because of fatigue.

I also note that Bopp's report states that Robinson's normal day (since he ceased working) consists of meditating, writing in his journal, reading, following the stock market, browsing websites, and reading and responding to email. Further, he tries to attend a weekly service and a Bible study group once a week. This level of mental activity appears to contradict Dr. Villanueva's conclusion that Robinson suffers from fatigue that limits his ability to concentrate for more than two hours a day.

Given the apparent fluctuations in Dr. Villanueva's medical conclusions and opinions on Robinson's fatigue, and given the terms of the Plan, it was reasonable for UNUM to require additional objective support for Robinson's claim that his sarcoidosis manifested itself in mental fatigue, which rendered him disabled beyond the twenty-four month period. UNUM notified

-22-

Robinson early on in the claims process that it may require additional information regarding Robinson's fatigue because it was "unsure" of the basis of the claim. Indeed, UNUM later suggested that Robinson undergo neuropsychological testing to establish proof of his mental fatigue.[5] Robinson never underwent additional testing and relied solely upon Dr. Villanueva's medical opinions.[6]

## C. The Alleged "Scheme of Denial"

I find no merit to Robinson's claim that UNUM acted in bad faith. UNUM has an obligation to ensure the veracity of claims of disability. It is also the responsibility of plan

---

[5] Robinson states that such testing would have been a "waste of time," since he believes UNUM predetermined that it was going to deny his claim at all costs. There is no indication in the record that UNUM would not have considered additional proof if submitted by Robinson. On the contrary, UNUM repeatedly sought additional information and considered it. Further, in its denial letter, it expressly suggested that Robinson submit additional evidence for its review.

[6] Robinson argues that Dr. Villanueva did conduct objective medical tests and found the results to be abnormal. Dr. Villanueva concluded that the results indicated that Robinson suffered from active sarcoidosis. First, Dr. Randall disagreed with the interpretation of some of the test results. Further, UNUM never challenged the diagnosis of sarcoidosis, rather, it challenged whether the manifestation of his condition - fatigue - rendered him unable to perform his occupation under the terms of the Plan.

administrator's to weigh the evidence before it, including conflicting medical and professional opinions.  In light of these duties and obligations, I can infer no bad faith from UNUM's conduct in this case.  UNUM notified Robinson from the beginning that it was "unsure" about his claim of disability due to fatigue.  Even though it appears that UNUM could have flatly rejected Robinson's claim under the Plan's self-reported symptoms limitation, it repeatedly requested additional information from Robinson and his treating physician in order to fully consider the claim before it.

Lastly, I find no merit to the assertion that Dr. Randall's opinion served as the "blueprint" for a "scheme of denial."  It is true that UNUM's initial denial letter fully explained its position and incorporated the medical conclusions of its associate medical director, Dr. Randall.  This, by itself, does nothing to demonstrate that UNUM acted in bad faith.  Further, the fact that UNUM's vocational assessment, requested FCE, and medical reviews occurred at different times does not prove that UNUM acted in bad faith.  Robinson offers nothing to support his claim that UNUM somehow plotted to deny Robinson's claim.

D.   **The Record Supports UNUM's Decision**

According to UNUM's letter to Robinson notifying him of the termination of his benefits, UNUM's conclusion that Robinson could perform his regular occupation was based upon all the medical and vocational evidence in the record. This evidence included: (1) Dr. Villanueva's correspondence to UNUM; (2) Robinson's medical records; (3) Dr. Randall's review of Robinson's medical records and Dr. Villanueva's correspondence; (4) the results of the FCE; and (5) UNUM's vocational assessment report.

Although Dr. Randall disagreed with the medical conclusions of the treating physician, Dr. Villnueva, this is not enough to render UNUM's decision arbitrary or capricious. See Vlass, 244 F.3d at 30; Terry, 145 F.3d at 41; Doyle, 144 F.3d at 184. The same may be said about the disagreement between the results of the FCE and Bopp's report. Given: (1) the results of the FCE; (2) Dr. Randall's opinion; (3) the lack of objective support regarding Robinson's inability to concentrate; (4) the fluctuations in Dr. Villanueva's assessment of Robinson's fatigue; (5) Dr. Moschella's progress notes; and (6) the vocational assessment report, UNUM's decision was not arbitrary and capricious. At best, the record does not reflect a single,

clear conclusion as to Robinson's disability status due to mental fatigue.

Based upon a review of the entire record, UNUM's decision was supported by evidence that was "reasonably sufficient to support [its] conclusion." <u>Vlass</u>, 244 F.3d at 30. While I may have weighed the evidence in this case differently, I may not substitute my judgment for that of UNUM. <u>See</u> <u>Terry</u>, 145 F.3d at 40; <u>Doyle</u> 144 F.3d at 184.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, I deny Robinson's motion for judgement on the administrative record (Doc. No. 9) and grant UNUM's motion for judgment on the administrative record (Doc. No. 8).

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

March 12, 2003

cc:   James C. Wheat, Esq.
      Byrne J. Decker, Esq.